SATURN OIL & GAS COMPANY, Inc.,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 5582.

United States Court of Appeals
Tenth Circuit.

Nov. 20, 1957.

Writ of Certiorari Denied March 3, 1958.

See 78 S.Ct. 542.

William H. Chamberlain, Springfield, Ill., and Chisman Hanes, Washington, D. C. (Gerald G. Schulsinger, and Klagsbrunn, Hanes & Irwin, Washington, D. C., on the brief), for petitioner.

Willard W. Gatchell, Washington, D. C. (Robert L. Russell, Washington, D. C., on the brief), for respondent.

Charles R. Nesbitt, Oklahoma City, Okl., W. A. Delaney, Jr., Ada, Okl., Jack M. Campbell, Roswell, N. M., George W. Anderson, Jr., Wichita Falls, Tex., and John Davenport, Austin, Tex., amici curiae, for Texas Independent Producers & Royalty Owners Ass'n of Austin, Texas, East Texas Oil Ass'n, Tyler, Texas, Independent Producers & Royalty Owners Ass'n of New Mexico, Roswell, New Mexico, Kansas Independent Oil & Gas Ass'n, Wichita, Kansas, Louisiana Independent Producers & Royalty Owners Ass'n, Baton Rouge, Louisiana, North Texas Oil & Gas Ass'n, Wichita Falls, Texas, Oklahoma Independent Petroleum Ass'n, Oklahoma City, Oklahoma, West Central Texas Oil & Gas Ass'n, Abilene, Texas, and Panhandle Producers & Royalty Owners Ass'n, Amarillo, Texas.

Before BRATTON, Chief Judge, and HUXMAN and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Saturn Oil & Gas Company,[1] by its petition, seeks a review, pursuant to section 19(b) of the Natural Gas Act,[2] of orders of the Federal Power Commission[3] which found that sales of natural gas by Saturn are sales in interstate commerce for resale and by reason thereof Saturn is a "natural-gas company" within the meaning of the Natural Gas Act. Saturn contends that it is not subject to the Act.

Saturn is a small unintegrated oil company which owns and operates natural-gas properties only in the State of Kansas. Saturn's production is from forty-five wells, forty of which are the subject of this proceeding. All of these wells are located in the Hugoton Field in the State of Kansas. In these wells Saturn has varying interests. The gas is sold under long-term contracts to Panhandle Eastern Pipe Line Company[4] and to Northern Natural Gas Company.[5] Saturn has no affiliation or connection with either of these companies. Saturn does not now and never has served any community or any main line industrial consumer at wholesale or retail. It does not now and never has held itself out as being willing to serve the public generally.

The gas sales by Saturn are unusual in that the product is a very dry gas requiring neither processing nor dehydration to make it ready for transportation and consumption and in that the sales are at the wellhead.

Of the forty wells involved, thirty-four are owned jointly by Saturn and Panhandle and one well is owned by the same parties and by a third interest. These thirty-five wells are operated by Panhandle under an operating agreement which designates Panhandle as the oper-

1. Hereinafter referred to as Saturn.

2. 15 U.S.C.A. § 717r(b). The Natural Gas Act is found at 52 Stat. 821–833, 15 U.S.C.A. §§ 717–717w.

3. Hereinafter referred to as Commission.

4. Hereinafter referred to as Panhandle.

5. Hereinafter referred to as Northern.

ating manager with authority to purchase for itself or to sell to others the gas produced. There is a further agreement with Panhandle relating to the purchase of the gas. In the joint operating agreement the point of delivery is "at the mouth of the several jointly owned wells." In the Panhandle purchase contract the delivery point is "at the wells."

Gas from the remaining five wells is sold by Saturn to Northern. The Northern purchase contract provides for delivery "at the points of connection of Northern's well-gathering pipe line with the side gate valves of Seller, installed on the wellhead of Seller's wells." It is clear that all the sales by Saturn to Panhandle and to Northern are sales at the wellhead.

The report of the examiner, affirmed by the Commission, states, with reference to the facilities of Saturn and the delivery of gas by Saturn, that:

"Saturn owns no facilities beyond its 'Christmas tree' at each well, with the exception, in some instances, of a few inches of pipe between the 'Christmas tree' and the meter of the purchasing company. In the other instances the meters are attached to the 'Christmas tree.' All meters are owned by the purchasers. As a part of Saturn's 'Christmas trees' at these wells there is a valve by means of which the flow of gas from the well and into the purchaser's meter may be controlled. These valves are operated by the purchasers of the gas. Saturn owns no pipelines, no processing or manufacturing plants, and no other type of natural-gas facilities than those used in the production of its gas and the delivery thereof at the wellhead to Panhandle and Northern."

Panhandle and Northern are each interstate pipeline companies. After the delivery of gas by Saturn at the wellhead, either to Panhandle or to Northern, it is commingled in the pipelines of the purchaser with other gas which has been obtained from other wells in the Hugoton Field. A "substantial majority" of this commingled gas is transported in the pipelines of these two purchasers beyond the boundaries of Kansas and into other states for resale.

The proceedings before the Commission which gave rise to this petition for review were initiated by Saturn. By proper and timely filings in compliance with Federal Power Commission Order No. 174–A, Saturn requested the Commission to find that it is not a natural-gas company within the meaning of the Natural Gas Act and was, therefore, entitled to continue its business without securing a certificate of public convenience and necessity. The examiner found that Saturn is a natural-gas company and that its sales of natural gas to Panhandle and Northern are subject to the jurisdiction of the Commission.[6] Saturn duly

---

6. The examiner made the following findings and arrived at the following conclusions:

"(1) Saturn is an independent producer of natural gas engaged in the sale of natural gas in interstate commerce for resale for ultimate public consumption and, by reason thereof, is a 'natural-gas company' within the meaning of the Natural Gas Act and subject to the jurisdiction of the Commission under the Act.

"(2) Saturn's sales of natural gas to Panhandle and Northern are made in interstate commerce, and together with the operation of any facilities subject to the jurisdiction of the Commission necessary therefor, are subject to the requirements of subsections (c) and (e) of Section 7 of the Natural Gas Act.

"(3) Saturn is able and willing properly to do the acts and to perform the service for which a certificate is applied for by it, and to conform to the provisions of the Natural Gas Act, and the requirements, rules and regulations of the Commission thereunder.

"(4) The sale of natural gas by Saturn to Panhandle and Northern herein described, together with the operation of any facilities subject to the jurisdiction of the Commission necessary therefor, is required by the public convenience and necessity, and a certificate therefor should be issued as hereinafter ordered and conditioned."

excepted to the decision of the examiner but its exceptions were denied by the Commission which affirmed the decision of the examiner. A petition for rehearing filed by Saturn was denied and the matter was brought here on petition for review. By permission of the court the attorneys for various oil and gas associations have been permitted to file a joint brief as amici curiae.

The basic question presented is whether natural-gas sales at the wellhead by a small unintegrated company to an interstate pipeline company for resale for ultimate public consumption are controlled by the Natural Gas Act.

Section 1(b) of the Natural Gas Act[7] defines thus the area of applicability of the Act:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

Section 2(6)[8] states:

" 'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

Saturn vigorously asserts that its wellhead sales are within the exemption contained in section 1(b) because they are made prior to gathering. This position is made clear by the following paraphrase of section 1(b):

"The provisions of this chapter * * * shall not apply * * * to the production or gathering of natural gas."

Production of gas is the act of bringing forth gas from the earth. Gathering of gas is the act of collecting gas after it has been brought forth from the earth.[9] The Saturn sales are after the gas has been brought forth from the earth but they are prior to gathering in that the gas is sold before it is commingled with gas produced from any other source of supply and before it is processed, stored, or artificially pressurized.

The exact factual situation involved here has not as yet been passed on by the United States Supreme Court or by any court of appeals. In Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, the Commission found that the sales by Phillips "are part of the production and gathering process, or are 'at least an exempt incident thereof.' "[10] The court rejected this finding saying that "production and gathering, in the sense that those terms are used in § 1(b), end before the sales by Phillips occur."[11] The physical operations present in the gas sales by Phillips were described by the court as follows:[12]

"The gas flows from the producing wells, in most instances at well pressure, through a network of converging pipelines of progressively larger size to one of twelve processing plants, where extractable products and impurities are removed. * * * After processing is complet-

7. 15 U.S.C.A. § 717(b).

8. 15 U.S.C.A. § 717a(6).

9. These definitions are from the dissenting opinion of Justice Black in Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 518, 69 S.Ct. 1251, 93 L.Ed. 1499, but they are consistent with the meaning given these terms in the majority opinions in that case and in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 597–604, 65 S.Ct. 829, 89 L.Ed. 1206, and in Interstate Gas Co. v. Federal Power Commission, 331 U.S. 682, 689–691, 67 S.Ct. 1482, 91 L.Ed. 1142.

10. 347 U.S. 677, 74 S.Ct. 796.

11. 347 U.S. 678, 74 S.Ct. 797.

12. 347 U.S. 675, 74 S.Ct. 795.

ed, the gas flows from the processing plant through an outlet pipe, of varying lengths up to a few hundred feet, to a delivery point where the gas is sold and delivered to an interstate pipeline company. The gas then continues its flow through the interstate pipeline system until delivered in other states."

The Phillips decision thus involved a factual situation in which the sales were made after production and gathering.

In Natural Gas Pipeline Co. v. Panoma Corp., 349 U.S. 44, 75 S.Ct. 576, 99 L.Ed. 866, the court in a short per curiam opinion said:

"In these cases, Oklahoma has attempted to fix a minimum price to be paid for natural gas, *after its production and gathering has ended,* by a company which transports the gas for resale in interstate commerce. We held in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, that *such* a sale and transportation cannot be regulated by a State but are subject to the exclusive regulation of the Federal Power Commission. The Phillips case, therefore, controls this one." (Emphasis supplied.)

The Fifth Circuit has recently considered four cases [13] wherein that court upheld the jurisdiction of the Commission over natural-gas sales by producers to interstate pipeline companies. Counsel have furnished us with a copy of the majority opinion and a copy of the dissenting opinion in one case, Deep South Oil Co. v. Federal Power Commission.[14] According to the copy of the majority opinion with which we have been supplied, Deep South is a small uninte-

grated corporation which produces gas from fourteen wells in the Big Hill Field of Texas and sells gas to the Texas Gas Corporation. In connection with such sale and delivery of gas the Fifth Circuit said: [247 F.2d 884]

"Prior to delivery under the contract, the 'casinghead gas' is separated from the oil with which it is produced at a field separator, and the 'full stream gas' is treated for the removal of water at a so-called 'freewater knockout.' Within a few feet from the point at which the gas leaves the aforementioned mechanical devices, it passes into Texas Gas' meters which are located on the leases near the wellheads from which the gas is produced. There it is measured and delivered and title thereto passes to Texas Gas."

The Deep South opinion does not make it clear as to whether there is any collection or gathering of the gas before it passes through the "field separator" or the "freewater knockout." We are not informed as to the factual situation in the Shell, Humble and Continental decisions of the Fifth Circuit.

The Phillips and Panoma cases involve sales after production and gathering. The Deep South case involves sales after a horizontal movement of the gas from the wellhead to a processing plant. So far as Saturn is concerned, the testimony is that the facilities owned by Saturn end with the several devices at the top of the well which are collectively known as the Christmas tree.[15] Delivery by Saturn is made into the meter which is owned and operated by the purchaser and connects with Saturn's meter valves which are a part of the Christmas tree and may be

---

13. Deep South Oil Co. of Texas v. Federal Power Commission, 5 Cir., 247 F.2d 882; Shell Oil Co. v. Federal Power Commission, 5 Cir., 247 F.2d 900; Humble Oil & Refining Co. v. Federal Power Commission, 5 Cir., 247 F.2d 903; and Continental Oil Co. v. Federal Power Commission, 5 Cir., 247 F.2d 904.

14. In two of the cases, Shell Oil Co. v. Federal Power Commission and Humble Oil & Refining Co. v. Federal Power

Commission, applications for certiorari have been filed with the United States Supreme Court and at this date have not been ruled on. See Docket Nos. 449 and 459, October Term, 1957.

15. Howard R. Williams and Charles J. Meyers in their 1957 work "Oil and Gas Terms" define Christmas tree as "the assembly of valves, pipes and fittings used to control the flow of oil and gas from the casinghead."

used to cut off delivery. The president of Saturn, testifying as to the point of connection, said that Saturn had no properties beyond the Christmas tree except a line of a few inches to the meter and that in some instances the meter was attached directly to the Christmas tree.

In determining the effect of the factual difference which exists as to Saturn, consideration must be given to the Phillips decision. The court there states that the primary aim of the Natural Gas Act was the "[p]rotection of consumers against exploitation at the hands of natural-gas companies." [16] In connection with the exemptions contained in section 1(b), the court quoted with approval its statement in Interstate Natural Gas Co. v. Federal Power Commission, supra, that "[e]xceptions to the primary grant of jurisdiction in the section [1(b)] are to be strictly construed." [17] The court then went on to say that it based its decision in Interstate on the broad ground that "sales in interstate commerce for resale by producers to interstate pipeline companies do not come within the 'production or gathering' exemption." [18]

With reference to the intent of Congress the court said in Phillips that: [19]

"" * * *, we believe that the legislative history indicates a congressional intent to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and *whether occurring before, during, or after transmission by an interstate pipeline company.*" (Emphasis supplied.)

With further reference to the congressional intent, the court said: [20]

"" * * * we are satisfied that Congress sought to regulate wholesales of natural gas occurring at both ends of the interstate transmission systems."

In the Phillips case the court had before it the question of the jurisdiction of the Commission over sales of gas, after production and gathering had ended, in interstate commerce for resale. Rather than base its decision on the inapplicability of the production or gathering exemption, the court held that the Commission had jurisdiction over "all wholesales of natural gas in interstate commerce * * * whether occurring before, during, or after transmission by an interstate pipeline company." [21] In their concurring opinion on the adoption of the Federal Power Commission Order No. 174–B, Commissioners Smith and Stueck summarized thus the situation presented by the Phillips decision: [22]

"Depending upon whether prime emphasis is attached to the precise facts presented in the case of Phillips or to the broad language used in the dictum of the Supreme Court's opinion, arguments can be made for either of the extremes of possible interpretations of that decision: that our jurisdiction is limited to the sale of natural gas at the tailgate of the processing plant, or the point where the natural gas enters the interstate pipe line, or, in the alternative, that our jurisdiction extends to every well-head sale in the field, or to the point of the first sale of natural gas for resale, wherever that may be, if interstate commerce turns out ultimately to be involved. Both interpretations have their advocates; both have been urged upon us."

Before stating our conclusions as to the effect of the Phillips decision certain other arguments of Saturn should be noted. One of these is that the Phillips decision is not a controlling prece-

16. 347 U.S. 685, 74 S.Ct. 800.

17. 347 U.S. 679, 74 S.Ct. 797 quotes 331 U.S. 690–691, 67 S.Ct. 1487.

18. 347 U.S. 680–681, 74 S.Ct. 798.

19. 347 U.S. 682, 74 S.Ct. 799.

20. 347 U.S. 683–684, 74 S.Ct. 800.

21. 347 U.S. 682, 74 S.Ct. 799.

22. 4 Oil and Gas Reporter 919, reporting decision of Federal Power Commission dated December 16, 1954, in Docket Nos. R–137 and R–138.

dent because it involved a large integrated company,[23] whereas Saturn is a small unintegrated company. This asserted distinction does not appeal to us. There is nothing in the Natural Gas Act which makes its applicability depend on the size or the integration of the gas operator. The Phillips decision holds that the Act applies to all wholesales by producers. Saturn may not escape regulation because of its size or because of the restricted nature of its operations.

■ Saturn further urges that the extension of the jurisdiction of the Commission to wellhead sales destroys the power of the states to exercise their constitutional power over the conservation of natural resources, a power which has been traditionally used to regulate the production and gathering of natural gas. Specifically, Saturn points out that Kansas, in the proper exercise of this power, has fixed a minimum wellhead price for natural gas produced from the Hugoton Field, the field involved in the Saturn operations now before the court. This minimum price order has been upheld by the Kansas Supreme Court.[24] Most obviously there cannot be a dual control of wellhead sales by the State Corporation Commission of Kansas and by the Federal Power Commission. At the same time it may well be observed that a minimum wellhead price is an effective conservation control measure. Similar state action has been upheld in Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, and Phillips Petroleum Co. v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L. Ed. 204. But as observed in the Panoma decision,[25] those cases dealt with constitutional questions and not with the construction of the Natural Gas Act.

The conflict between federal and state authority is recognized in Interstate Natural Gas Co. v. Federal Power Commission wherein the court said: [26]

"Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern. It was the intention of Congress to give the States full freedom in these matters. Thus, where sales, though technically consummated in interstate commerce, are made during the course of production and gathering and are so closely connected with the local incidents of that process as to render rate regulation by the Federal Power Commission inconsistent or a substantial interference with the exercise by the State of its regulatory functions, the jurisdiction of the Federal Power Commission does not attach. But such conflict must be clearly shown. Exceptions to the primary grant of jurisdiction in the section are to be strictly construed. It is not sufficient to defeat the Commission's jurisdiction over sales for resale in interstate commerce to assert that in the exercise of the power of rate regulation in such cases, local interest may in some degree be affected."

This would seem to dispose of the point. The jurisdiction of the Commission is not defeated by state regulatory action.

■ Saturn uses the above quotation from Interstate as the basis for the contention that the Act was never intended to apply to wellhead sales because such sales are made during production and

23. An integrated oil company has been defined as a company engaged in all phases of the oil industry, from exploration for oil deposits to retail sale of oil products (including gasoline). These phases in outline are: exploration, production, transportation, manufacturing and refining, and retailing. See Oil and Gas Terms, supra, p. 128.

24. See Cities Service Gas Co. v. State Corporation Commission, 180 Kan. 454, 304 P.2d 528. This decision has been appealed to the United States Supreme Court and probable jurisdiction noted, 353 U.S. 971, 77 S.Ct. 1055, 1 L.Ed.2d 1134.

25. 349 U.S. 45, 75 S.Ct. 576.

26. 331 U.S. 690–691, 67 S.Ct. 1487.

gathering and are only technically consummated in interstate commerce. In this regard Saturn paints a sorry picture of the impact on the nation's economy of what it describes as a nationalization of the gas business. The brief of the amici curiae points out the hardships which will fall on the great group of independent gas producers if they are subjected to the drastic controls of the Natural Gas Act.[27] The argument, however, is not based on any constitutional ground. It goes merely to the wisdom of the Act. That is a question for Congress, not for the courts.

■ In the final analysis the question resolves itself into a determination of whether the Phillips decision is to be viewed in the light of its precise facts or in the light of the broad language of the court. We are convinced that the court with full recognition of the precise facts, which it detailed in its opinion, carefully refrained from basing its decision on the inapplicability of the exemption and held that the production or gathering exemption of section 1(b) did not apply to exclude from the jurisdiction of the Commission sales by any producer of natural gas for transportation interstate for resale to the public. We are bound by the Phillips decision.

■ Saturn says that this amounts to a nullification of the production or gathering exemption. We do not agree. In Colorado Interstate Gas Co. v. Federal Power Commission the court, in dealing with the contention that its disposition of the case gave no meaning to the production or gathering exemption of section 1(b), said:[28]

"Certainly that provision precludes the Commission from any control over the activity of producing or gathering natural gas. For example, it makes plain that the Commission has no control over the drilling and spacing of wells and the like. It may put other limitations on the Commission."

In Interstate Natural Gas Co. v. Federal Power Commission[29] and Federal Power Commission v. Panhandle Eastern Pipe Line Co.[30] the court recognized that effect must be given the production or gathering exemption. These cases and Colorado Interstate Gas Co. v. Federal Power Commission[31] are referred to in the Phillips decision as holding that the production or gathering exemption applies to the physical activities, facilities, and properties used in the production and gathering of natural gas and not to the business of production and gathering.[32] Until there is a sale of the natural gas produced by such operations and installations in interstate commerce for resale, they are exempt. In the event of such a sale the jurisdiction of the Commission applies but only because of the sale and only to the extent that the Natural Gas Act confers jurisdiction.

■ This brings us to the final contentions of Saturn. The decision of the examiner, affirmed by the Commission, provides:

"A certificate of public convenience and necessity is hereby issued to Saturn Oil & Gas Company, Inc., upon the terms and conditions of this order, authorizing the sale by it to Panhandle Eastern Pipe Line Company and Northern Natural Gas

27. If all sales of natural gas which are made before production and gathering have ended and which are for interstate transportation for resale are within the Act, numerous problems are presented. For example, must every royalty holder or working-interest owner who has the right to take gas in kind and who sells at the wellhead to an interstate pipeline company obtain a certificate of convenience and necessity and file a rate schedule? If this is necessary, the Federal Power Commission is faced with a tremendous administrative task.

28. 324 U.S. 581, 602–603, 65 S.Ct. 829, 839, 89 L.Ed. 1206.

29. 331 U.S. 690, 67 S.Ct. 1487.

30. 337 U.S. 504–505, 69 S.Ct. 1255–1256.

31. 324 U.S. 581, 65 S.Ct. 829.

32. 347 U.S. 678, 681, 74 S.Ct. 796, 798.

Company of natural gas in interstate commerce for resale, *together with the continued operation of any facilities necessary therefor and subject to the jurisdiction of the Commission,* all as more fully described in the record of this proceeding and the findings heretofore made." (Emphasis supplied.)

Saturn says that the effort to certify production facilities violates the production or gathering exemption. To us it is clear that facilities necessary to effect a sale of gas in interstate commerce are facilities used in interstate commerce and are within the jurisdiction of the Commission. This would seem to be the plain intent of section 7(c).[33] The Third Circuit has so held in J. M. Huber Corp. v. Federal Power Commission, 3 Cir., 236 F.2d 550, 556.

The failure to identify the facilities is said to contravene the Fifth Amendment in that the definitive standards required by due process are absent. The record does not disclose any controversy as to whether any particular facility is within or without the jurisdiction of the Commission. Certainly Saturn is not injured when all the facilities necessary for its sales to Panhandle or Northern are certificated. The act of sale in interstate commerce for resale commits the facilities necessary to effectuate such a sale to regulation by the Commission to the extent of its jurisdiction. The test is whether the continued operation of a facility is necessary to the delivery of the gas sold. The generality of the certificate favors Saturn. The standard is ascertainable. It follows that there is no denial of due process.

Much of the argument by Saturn and by the amici curiae goes to the allegedly disastrous effect on the oil and gas business and on the national economy which will result from an affirmance of the Commission's order. This argument should be directed to Congress and not to the courts.

The petition for review is denied.