**SUN OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 17040.**

United States Court of Appeals Fifth Circuit.

April 17, 1959.

Rehearing Denied June 3, 1959.

C., E. M. Cage, Dallas, Tex. (Omar L. Crook, May, Shannon & Morley, Washington, D. C., on the brief), for petitioner.

Willard W. Gatchell, Gen. Counsel, Howard E. Wahrenbrock, Solicitor, William W. Ross, Atty., Federal Power Comm., Washington, D. C., for respondent.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Sun Oil Company, herein called Sun, made a contract bearing date August 26, 1947, with Southern Natural Gas Company, herein referred to as Southern, for the sale to the latter of natural gas to be produced by Sun from the Gwinville Field in Mississippi. The contract provided that it should be in effect for ten years commencing on the date of the first delivery of gas by Sun to Southern. This date was September 3, 1947. The contract provisions as to price were in these terms:

"Subject to the provisions of Article VI hereof, providing for a possible adjustment in price, Buyer agrees to pay Seller for all gas purchased hereunder a price

(1) of seven and one-half cents (7½¢) for each one thousand (1,000) cubic feet of gas during the first five (5) years of the term hereof;

(2) of eight cents (8¢) for each one thousand (1,000) cubic feet of gas during the second five (5) years of said term."

Immediately following the foregoing was this proviso:

"In this connection, it is understood that by this agreement Seller is not dedicating to Buyer, or to Buyer's market outlet, any portion of Seller's gas reserves in the Gwinville Gas Field or any portion of the gas produced by Seller from its wells in said field, but that Seller is simply selling and Buyer is purchasing the quantity of gas called for

Martin A. Row, Leo J. Hoffman, Dallas, Tex., Robert E. May, Washington, D

in this agreement on the terms specified in this agreement and for the price set out above; * * *."

Subsequent to the Phillips Petroleum case,[1] decided on June 7, 1954, the Federal Power Commission supplemented the provisions of the Natural Gas Act, 15 U.S.C.A. § 717 et seq., by issuing its so-called No. 174 series of orders [2] which required independent producers of natural gas to file rate schedules and apply for certificates of public convenience and necessity. Sun applied for and procured a certificate of public convenience and necessity authorizing the sale of natural gas to Southern. It filed the contract as a rate schedule under Section 4 of the Natural Gas Act.[3]

■ Prior to the termination of their agreement Sun and Southern made a new agreement in 1957 which was to become effective upon the expiration of the 1947 agreement. This provided for continued deliveries of gas in the same field and with the same facilities. The contract was, for the most part, substantially the same as that which it succeeded. The primary difference was an increase from 8¢ per Mcf to 20¢ per Mcf of gas. Sun then applied, under the new contract, for a new certificate of public convenience and necessity and filed the new contract as an initial rate schedule. The Commission rejected the application and filing on the ground that, the same service being involved, any new certificate would merely duplicate the earlier certificate which was still effective and outstanding and the proposed rate filings were of rate changes rather than initial rate filings. Protesting the Commission's order and reserving its right to contest it, Sun resubmitted the 1957 contract as a rate change. The Commission then, as is authorized by Section 4 of the Act, suspended the effectiveness of the rate change for the statutory period of five months. At the expiration of the five-month period, the 20¢ rate was placed in effect and Sun undertook to make such refunds as might be required. Sun has petitioned this Court to review the order of the Commission rejecting the application for a certificate and an initial rate filing, and the order suspending the rate change. Although a number of specifications of error are made, most of them are hinged upon the proposition that the rate set forth in the new contract was an initial rate filing, and the collateral doctrine that the certificate of public convenience and necessity which was originally issued had expired and become functus officio upon the date fixed for the expiration of the first contract by its terms.

It is "rates and charges" that are subject to regulation.[4] The method of filing and regulating rates has thus been succinctly stated.

"The Act requires natural gas companies to file all rates and contracts with the Commission § 4(c) and authorizes the Commission to modify any rate or contract which it determines to be 'unjust, unreasonable, unduly discriminatory or preferential', § 5(a). Changes to previously filed rates or contracts must be filed with the Commission at least 30 days before they are to go into effect § 4(d), and, except in the case of industrial rates, the Commission may suspend the operation of a new rate pending a determination of its reasonableness. § 4(e). If a decision has not been reached before the period of suspension expires, a maximum of five months, the filed rate must be allowed to go into effect, but the Commission's order may be made retroactive to that date." United Gas Pipe Line Company v. Mobile Gas Service Corporation, 350 U.S. 332, 76 S.Ct. 373, 377, 100 L.Ed. 373, 12 P.U.R.3d 112. In the Mobile case United was obligated by contract to furnish gas to Mobile at a

1. Phillips Petroleum Company v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, 3 P.U.R.3d 129.

2. 18 C.F.R. §§ 154.91–154.102, §§ 157.23–157.31.

3. 15 U.S.C.A. § 717c.

4. Natural Gas Act, § 4(a), 15 U.S.C.A. § 717c(a).

fixed rate during the contract period of ten years. There was no provision for any different rate nor was there any provision made for changing the rate during the contract term. United undertook to effect a rate increase by filing a new rate schedule with the Commission. It was held that the Natural Gas Act gave no power to put unilateral rate increases into effect, and that United could procure a rate increase, if at all, only by an order of the Commission entered in a proceeding under Section 5 of the Act.

It is urged that the decision in Mobile recognizes a freedom of contract in rate making applicable alike to new contracts and to renewal contracts. The "philosophy of Mobile", as it is referred to, is such as to require, it is contended, a holding that when a contract has, by the law of contracts, terminated, the parties are permitted to fix rates for the continued service, free from Section 4 regulation, in the same manner that might have been done before the passage of the Act. We do not think the doctrine of Mobile applies in a situation such as is before us here. In United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153, rehearing denied 358 U.S. 942, 79 S.Ct. 344, 3 L.Ed.2d 350, it was held that Section 4 procedures were available where rate increases were proposed pursuant to a "going rate" provision in the contract. The purpose of Congress was carried out in framing its regulatory scheme "not only by preserving the 'integrity' of private contractual arrangements for the supply of natural gas, * * * (subject of course to any overriding authority of the Commission), but also by providing in § 4 for the earliest effectuation of contractually authorized or otherwise permissible rate changes consistent with appropriate Commission review." 358 U.S. 114, 79 S.Ct. 200, 3 L.Ed.2d 153.

The same doctrine has been applied where the contract contained a "favored nation" clause and it has been held that rate increases under such a clause are subject to Section 4 of the Act. Mississippi Power & Light Co. v. Memphis Natural Gas Co., 5 Cir., 1947, 162 F.2d 388, 71 P.U.R., N.S., 182, certiorari denied 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355. So too it has been held that rate increases pursuant to the escalator clause of a contract which predated the Phillips decision of June 7, 1954, were rate changes subject to Section 4 of the Act and not initial rates subject to Commission review only under Section 5 of the Act. Bel Oil Corporation v. Federal Power Commission, 5 Cir., 1958, 255 F.2d 548, 24 P.U.R.3d 512, certiorari denied 358 U.S. 804, 79 S.Ct. 46, 3 L.Ed.2d 77. It necessarily follows that where, upon the termination of a contract fixing a rate which was the subject of an initial rate filing with the Commission, a new contract is made between the same parties for the same service as was provided by the terminated contract but at a higher rate, the new rate is a rate change and subject to the provisions of Section 4 of the Act, including the provisions relating to the suspension of the rate. The rate fixed by the new contract is not an initial rate which could be changed only by order of the Commission in a proceeding under Section 5.

■■ The foregoing disposes of the principal question presented. Other questions remain. The Petitioner contends that since its certificate originally issued authorized the sale by it of natural gas "as more fully described in the application and exhibits", and since the certificate was issued under an order providing that the certificate "shall be effective only so long as the Applicant continues the acts or operations hereby authorized," it must follow that the certificate expired with the contract and the rejection by the Commission of the application for a new certificate was invalid. This contention is based upon a misconception of the purpose and effect of the certificate. The authorization of the certificate is not only for the sale of gas pursuant to the contract but pursuant to and subject to the provisions of the Act and regulation pursuant thereto

by the Commission. The Commission has the power under Section 7(c) and (e) of the Act, 15 U.S.C.A. § 717f(c, e), to issue certificates of public convenience and necessity of limited duration. Sunray Mid-Continent Oil Co. v. Federal Power Commission, 353 U.S. 944, 77 S. Ct. 792, 1 L.Ed.2d 794, 18 P.U.R.3d 320. Whether, in this case, the Commission could have granted a certificate limited to the life of the contract, without abusing its discretion, need not be decided. We find nothing to show any intent of the Petitioner to apply for a limited or conditional certificate, nor do we find anything to indicate that the Commission intended to limit its certificate. The matters to which the Petitioner points do not permit of the inference which it would have us draw.

■ The Petitioner asserts that because of the rejection of the application for a second certificate without a hearing after notice there was a violation of the administrative requirement of Section 7(c) of the Act, 15 U.S.C.A. § 717f (c). The Petitioner makes a like contention with respect to the rejection of its second contract as an initial rate filing. Where, as in this case, there could be no right to have a certificate of public convenience and necessity issued which duplicated a certificate outstanding and operative; and where, as here, the second contract was a nullity as an initial rate filing, it was proper to reject them without notice and without a hearing. Cf. United Gas Pipe Line Co. v. Mobile Gas Service Corporation, supra.

■ The Commission suggests that the orders which Sun brings before us for review are interlocutory and that administrative remedies have not been exhausted. To support this view reliance is placed upon Shank, Trustee, v. Federal Power Commission, 5 Cir., 1956, 236 F. 2d 830, 15 P.U.R.3d 408, certiorari denied 352 U.S. 970, 77 S.Ct. 361, 1 L.Ed. 2d 324, and Lee, Trustee, v. Federal Power Commission, 5 Cir., 1956, 236 F.2d 835, certiorari denied 352 U.S. 970, 77 S.Ct. 361, 1 L.Ed.2d 323. In the cited cases the orders were mere procedural steps in the administrative process. The orders which we here review are "of a definitive character dealing with the merits of a proceeding before the Commission" and, as such, are reviewable under Section 19(b) of the Act, 15 U.S.C.A. § 717r(b). Federal Power Commission v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408, 24 P.U.R.N. S. 394; Magnolia Petroleum Co. v. Federal Power Commission, 5 Cir., 1956, 236 F.2d 785, 15 P.U.R.3d 364, certiorari denied 352 U.S. 968, 77 S.Ct. 356, 1 L. Ed.2d 322. We see no need for the holding of a formal hearing and the taking of testimony where no fact issue was presented. Although the orders before us are, in a sense, procedural and interlocutory, they make a final disposition of questions of grave importance in the natural gas industry. The orders were formal determinations of rights of the petitioners and the effect of the orders was not contingent upon future administrative action. We have no doubt that these orders should be passed upon by this Court.

Sun urges that its contractual relationship with Southern is only for the sale of natural gas, that it engages in no service and renders no service, that it does not propose to abandon any facilities, that it has no facilities subject to the Commission's jurisdiction and hence it is not subject to Section 7(b) of the Act, 15 U.S.C.A. § 717f(b). Our decision in Continental Oil Company v. Federal Power Commission, 5 Cir., 266 F.2d 208, is controlling on this issue. A like contention was made before the Court of Appeals for the Third Circuit and its well reasoned conclusions are contrary to the position urged by Sun. J. M. Huber Corporation v. Federal Power Commission, 3 Cir., 1956, 236 F.2d 550, 15 P.U.R. 3d 434, certiorari denied 352 U.S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324. The principles there announced are sound and are applicable here. The decision of this Court in Deep South Oil Company of Texas v. Federal Power Commission, 5 Cir., 1957, 247 F.2d 882, 20 P.U.R.3d 469, is not in conflict.

It follows that the Commission's orders should be and hereby are

Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting).*

I am in full agreement with the Court that the orders are reviewable. I also accept, as binding on me, our prior decision in Bel Oil Corp. v. F. P. C., 5 Cir., 1958, 255 F.2d 548, certiorari denied 358 U.S. 804, 79 S.Ct. 46, 3 L.Ed.2d 77, holding that an automatic stepped-up escalator increase is a change of rate. I do that even though that decision was based primarily on our earlier one of Mississippi Power & Light Co. v. Memphis Natural Gas Co., 5 Cir., 1947, 162 F.2d 388, certiorari denied 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355, which in turn was pronounced in the pre-Mobile era when all thought that contracts of a natural gas company, as in the case of any other public utility, were subject to an overriding public regulation. Mobile accorded almost absolute sanctity to the private contract and rejected, without so much as a deferential footnote citation, the traditional and contrary concept of which Union Dry Goods Co. v. Georgia Public Service Corp., 1919, 248 U.S. 372, 39 S. Ct. 117, 63 L.Ed. 309, was the symbol as well as the *cause célèbre* around which the controversy raged before the Commission and the Third Circuit. 215 F.2d 883, 886.

But in the face of Mobile and what it teaches, I think the Court's substantive action affirming the Commission disregards the limited nature of the jurisdiction of the Federal Power Commission, ignores the special and decisive relevance of contract terms, and does all of this without a hearing. I cannot acquiesce in this and must therefore, with deference, dissent.

* Editorial note:
This opinion was prepared and filed as a separate opinion in each of the following cases: Sun Oil Company v. Federal Power Commission, 5 Cir., 266 F.2d 222; Hunt Oil Company v. Federal Power Commission, 5 Cir., 266 F.2d 232;

**I.**

At the outset I think it well to point out that in reality there is but one basic question. To split it up into apparently separate issues concerning the scope of the Certificate, the change of rate in the contract, or potential abandonment of service "facilities" really only confuses. That is so because these essentially beg the question. For example, if the new contract and its new price is a change of rate, then obviously, it is not an initial rate and it must be filed under Section 4(d) subject to supervision and rebate. If the "sale" is something apart from the contract which alone brought it about, so that it must continue after the contract has completely expired by its own terms, then no new Certificate is required, the original one is sufficient, and the new application should be denied. On the other hand, if the power of the Commission over the producer is limited to the "sale" reflected by the contract, then the grant of authority expired with the sales contract, so that a new Certificate would be required since all agree it is illegal to sell or transport or render service without a Certificate. Likewise, on that assumption, the old having expired, all there is is now new, and the new contract would be an initial rate subject only to § 5 review and not to § 4 interim suspension and rebate.

Each of these things results depending on the basic decision. But none is really a reason *why*.

I submit that a careful reading of the Court's opinion reflects that it finds no real reasons, and in the final analysis what it does, as it has done in Continental Oil Co. v. F. P. C., 5 Cir., 1959, 266 F.2d 208, is to arrive at its decision out of the conscientious belief that regulation is otherwise ineffectual. I would be the first to think that we could legis-

Richardson v. Federal Power Commission, 5 Cir., 266 F.2d 233; Magnolia Petroleum Company v. Federal Power Commission, 5 Cir., 266 F.2d 234; Humble Oil & Refining Company v. Federal Power Commission, 5 Cir., 266 F. 2d 235.

late interstitially, but that hardly includes engraftment or transplanting of a congenitally missing organ. If the supposed adverse results apprehended would occur, which I doubt, then Congress, not this Court, should be the surgeon.

## II.

The Court, after pointing out that we have held that during the life of an *existing contract,* an increase in price from the operation of a most-favored-nation's clause and from an automatic stepped-up escalation clause are rate changes subject to § 4 review, then sets forth as its sole reason which "disposes of the principal question presented" this language:

"It necessarily follows that where, upon the *termination* of a *contract* fixing a rate which was the subject of an initial rate filing with the Commission, a *new contract* is made between the same parties for the same service as was provided by the terminated contract but at a higher rate, the new rate is a rate change and subject to the provisions of Section 4 of the Act, including the provisions relating to the suspension of the rate. The rate fixed by the *new contract* is not an initial rate which could be changed only by order of the Commission in a proceeding under Section 5." (Emphasis supplied.)

Except for the imprimatur of this Court which states that it is *law,* I do not at all think it follows, either normally or naturally or *necessarily,* that "upon the *termination* of a contract" a "*new* contract is made between the same parties" is a rate change. To reason from *existing* contracts to entirely *new* ones after termination is a non sequitur flying in the face of Mobile.

The jurisdiction of the Commission is limited. The act at one end excludes all that is encompassed within production and gathering and, at the other end, the distribution and sale of it to the local consumer. § 1(b). It does not undertake to regulate the "business" of natural gas. "Three things and three [things] only Congress drew within its own regulatory power delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale. * * *." F. P. C. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 503, 69 S.Ct. 1251, 1255, 93 L.Ed. 1499.

As these producers are not engaged in transportation, the sole basis for jurisdiction is the *sale* for resale. For "until there is a sale of the natural gas produced by such operations and installations in interstate commerce for resale, they are exempt. In the event of such a sale the jurisdiction of the Commission applies but only because of the sale and only to the extent that the Natural Gas Act confers jurisdiction." Saturn Oil & Gas Co. v. F. P. C., 10 Cir., 1957, 250 F.2d 61, 68, certiorari denied 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532.

The *sale* is therefore vital. It is the alpha. Can this Court be right by holding that there is no omega?

This is important especially in view of the cyclonic case by case development under the Act subjecting the owner of a gas well to the awesome obligations of an orthodox utility despite the obvious " * * * fact that producers are in reality selling gas which they own and are not, in the traditional sense, primarily furnishing a service to the public." Gulf Oil Corp. v. F. P. C., 5 Cir., 1958, 255 F.2d 556, 557.

Local distributors cannot get natural gas without transmission lines. Transmission companies cannot obtain the needed astronomical financing unless the entrepreneurs have long-term commitments by distributors to take, and by producers to supply, the gas. Despite the fact that the long-term supply contract must deal with unknown economic factors of a kind which would ordinarily

permit a commodity owner to provide an ascertainable but adjustable formula to determine price, we have held that such agreed adjustments are rate changes. Bel Oil Corp. v. F. P. C., 5 Cir., 1958, 255 F.2d 548, 553. When such increase or "rate changes" are sought, the producer must satisfy the standards prescribed by the Commission to determine whether the rate will be "just and reasonable." § 4(a). Forest Oil Co. v. F. P. C., 5 Cir., 1959, 263 F.2d 622. To whatever extent any part of the producer's physical equipment serves to effectuate the sale or contain the gas at the point of sale delivery, it becomes a "facility" prohibiting abandonment of any "service" performed thereby. Continental Oil Co. v. F. P. C., 5 Cir., 1959, 266 F.2d 208.

I do not believe that Congress ever intended that the moment the first cubic centimeter of gas started its irrepressible journey from the bowels of the earth to a Brooklyn burner tip, the gas well owner had committed himself and his commodity irrevocably either to the purchaser or to the life and death regulatory power of a remote agency.

### III.

How was this likelihood to be avoided? Herein lies the explanation for stating the *grant* of power, and hence its *limitation,* in terms of *sale.* Power was not prescribed, as it might have been, in terms of "service," or the "furnishing," or the "supplying" of gas. What was required was a *sale.* This was a term having both an industry-gas-business relevance and a meaning readily understood by Congress. Despite the awkwardness which arises from the Phillips retrospective infusion of a general Congressional purpose to regulate sale by producers which the Commission and others for sixteen years thought to be nonexistent, this was as though Congress spelled out this policy: a producer need not sell for resale in interstate commerce; if he makes a sale, he will, for the duration of that sale, be subject to public utility regulation; when that sale is completed, he will then have the opportunity to reas-

sess his position and determine whether he will cease production, sell in intrastate commerce, or make a new sale for resale in interstate commerce. In this way there was some practical adjustment of the conceptual difficulties involved in subjecting, for the first time in the nation's history, the owner of an exhaustible natural resource to a limited regulation.

### IV.

I would quickly emphasize that I do not think that stating Commission jurisdiction in terms of *sale* inevitably ties jurisdiction to all of the refinements of the law of sales. But if, as this Court concludes—erroneously I think—that Congress used "production" in its everyday sense, Continental Oil Corp. v. F. P. C., 5 Cir., 1959, 266 F.2d 208, then it is an understatement to say that it certainly must have had in mind the usual connotations of a word and term so well understood and so much used as "sale." In this light, it meant at least a relationship growing out of a contract. " '[S]ale' is a word of precise legal import, both at law and in equity. It means, at all times, a contract between parties, to give and to pass rights of property for money—which the buyer pays or promises to pay the seller for the thing bought and sold." Williamson v. Berry, 1850, 8 How. 495, 544, 49 U.S. 495, 12 L.Ed. 1170. Curtis v. O'Leary, 8 Cir., 1942, 131 F.2d 240; 77 C.J.S. Sales § 1, at page 575 (1952).

There are four main elements to a sale, which is to say a contract, express or implied, of sale: (1) a seller and a buyer; (2) a commodity or service; (3) a price or consideration; and (4) a quantity or time. We know for certain that the Commission cannot order an involuntary sale by a producer to a pipe line, so element (1) is fixed by the parties. The gas producer is unlike the traditional public utility whose holding out binds him to serve all on common terms. Element (2) is confined to gas with the possible expansion into the area of a service facility. We likewise know for an

absolute certainty from Mobile, that the Commission cannot prescribe the price. This, too, is left to the parties subject only to a right to review by a hearing and on evidence under § 5. That takes care of element (3). On what basis, other than the insupportable one of judicial-administrative necessity can the Commission prescribe element (4)—that is, the *amount* of the commodity to be sold, whether expressed in terms of total quantity, or quantities for a stated term?

If the *amount* of the commodity, element (4), is thought of in terms of the *quantity* to be delivered, we know for a certainty that the Commission could not order a producer to deliver *more gas* than contracted for. This is so because, whatever else may be the vagaries of the § 1(b) production and gathering exclusion, the Commission lacks power to order more production. It could not, for example, compel a producer to rework a sickly well, explore a new horizon, attempt to exploit and tap a new reservoir, much less drill an additional well in order to permit, under state conservation laws, an increase in allowable production and hence deliveries to the pipe line purchaser. This prohibition is so far-reaching that the Commission even lacks the power to order an increase in *transportation* facilities because this would indirectly compel an increase in production. Panhandle Eastern Pipe Line Co. v. F. P. C., 3 Cir., 1953, 204 F.2d 675. See also F. P. C. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 504–505, 69 S.Ct. 1251, 1257, 93 L.Ed. 1499; Colorado Interstate Gas Co. v. F. P. C., 1945, 324 U.S. 581, 598, 65 S.Ct. 829, 89 L.Ed. 1206; F. P. C. v. Hope Natural Gas Co., 1944, 320 U.S. 591, 612–615, 64 S.Ct. 281, 88 L.Ed. 333; Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 678, 74 S.Ct. 794, 98 L.Ed. 1035; Interstate Natural Gas Co. v. F. P. C., 1947, 331 U.S. 682, 690, 67 S.Ct. 1482, 91 L.Ed. 1742.

Of course if the Commission cannot compel an increase in quantity deliverable under a contract, it may not do so by enlarging the period of *time* during which such deliveries are to be made. The result is the same. The impact is the same. In each case the Commission's order would be ineffectual unless *more* gas were produced, and this is forbidden territory to the Commission.

## V.

The Supreme Court makes two things clear. First, private contracts underlie the whole scheme of regulation. Second, such private contracts give way only by determination of the Commission made after notice, hearing and order. This basic approach pervades all said and done in Mobile.

"The Natural Gas Act * * * recognizes the need for private contracts of varying terms and expressly provides for the filing of such contracts as a part of the rate schedules. * * * By preserving the integrity of contracts, it [the Act] permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. * * * [T]he Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public. * * * Admittedly, the Act presumes a capacity in natural gas companies to make rates and contracts and to change them from time to time, but nowhere in the Act, is either power defined. The obvious implication is that, except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would possess in the absence of the act." 350 U.S. at pages 339, 343, 344, 345, 76 S.Ct. at page 381, 100 L.Ed. 373. See also United Gas Pipe Line Co. v. Memphis Light, Gas and Water

Division, 1958, 358 U.S. 103, 79 S. Ct. 194, 3 L.Ed.2d 153.

## VI.

Both expressed in the briefs of the Commission, and unexpressed but implicit in the Court's opinion, is the apprehension that administrative regulation would be thwarted if parties can prescribe the term (i. e., quantity) of the contract. Assuming that this is for us, rather than the Congress, there are at least three answers. First, we are not here dealing with purported contracts of short and artificial duration. All of the contracts were for the substantial term of 10 years. History has proved that they were genuine and were applied in good faith. Second, the new contracts are likewise of substantial duration. Even more so, because their terms are 20 years. This means that the "new" contracts are substantially different. They are not, as claimed, for the same service but only at a different price. One committing himself for two decades instead of 10 years not only to make the sales but to automatically submit himself to extensive Commission regulation during that period has done much more than simply renew a prior engagement. Third, there are now sufficient administrative tools to prevent any abuse of the accepted purpose of the Act through the spurious device of artificially short contract terms, or any other means by which parties attempt to create the appearance of a firm contract, but which is in fact but a paper transaction.

On the latter the Commission may grant a certificate of limited duration. Sunray Mid-Continent Oil Co. v. F. P. C., 10 Cir., 1956, 239 F.2d 97, reversed per curiam 353 U.S. 944, 77 S.Ct. 792, 1 L.Ed.2d 794. Conversely, it may grant them without limitation. As a condition to granting the initial Certificate, the Commission can determine whether the proffered contract is genuine and binding for a substantial period of time. If it thinks it not, it may decline the issuance of the Certificate. If, as

these cases present, a "new" Certificate is requested for the "new" contract, the Commission can again look at it. Unless the proposed contract subjects the producer to substantial obligations permitting effective regulation for the future, the Commission may decline the Certificate.

All it may not do is force a producer either to produce *more* gas, or sell *more* gas, or sell *more* gas for a longer time. If that is to occur after the expiration of the initial contract, it may be done only upon application of the parties pursuant to a new agreement. The Commission still has the last check since the condition for the grant of the new Certificate may be alteration in the terms of the agreement.

## VII.

Finally, all of this has come about with no hearing, with no opportunity for hearing, and with an absolute refusal of the Commission even to receive the various applications for the purpose of a hearing. Section 7(e) prescribes a hearing to determine whether a Certificate should be issued and whether, and to what extent, special conditions ought to be imposed on the grant. Section 7(c) requires that a hearing be held. Whether, and to what extent, the initial contracts were genuine, and whether, and to what extent, the "new" contracts were merely a continuation or something substantially different, involved at least questions of judgment which could not be foreclosed peremptorily by slamming the door shut before it was scarcely opened. Northeastern Gas Transmission Co. v. F. P. C., 3 Cir., 1952, 195 F.2d 872, certiorari denied Algonquin Gas Transmission v. Northeastern Gas Transmission Co., 344 U.S. 818, 73 S.Ct. 13, 97 L.Ed. 637; Mississippi River Fuel Corp. v. F. P. C., 3 Cir., 1953, 202 F.2d 899; Cities Service Gas Co. v. F. P. C., 10 Cir., 1958, 255 F. 2d 860. The Administrative Procedure Act, 5 U.S.C.A. §§ 1001–1011, applicable to the Federal Power Commission, State Corporation Commission of Kansas v. F. P. C., 8 Cir., 1953, 206 F.2d 690,

likewise assures a hearing. Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616; Riss & Co. v. United States, D.C.W.D.Mo., 1950, 96 F.Supp. 452, reversed, 1951, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345.

The peremptory nature of the Commission proceedings which we approve is dramatically demonstrated by the Court's reference to the producer's contentions under § 7(b). To the argument of the producer that "it engages in no service and renders no service, that it does not propose to abandon any facilities, that it has no facilities subject to the Commission's jurisdiction and hence it is not subject to Section 7(b) of the Act * * *," the Court holds "our decision in Continental Oil Company v. Federal Power Commission, 5 Cir., 266 F.2d 208, is controlling on this issue." Accepting, for the moment, the correctness of our decision in Continental Oil Company, that decision deals at length with minute facts concerning a specific well which was the subject of an extensive hearing. In this proceeding, without hearing without evidence, without knowing whether, in the sense of Continental Oil Company, there is any "facility" by which the service is performed, this Court proceeds to declare that the Commission could take similar action.

The joint effect of these opinions today announced is to destroy the last remnant of the § 1(b) production and gathering exclusion. By forcing the owner of a natural resource to continue deliveries until the reservoir is exhausted, and to continue the delivery of gas if some piece of equipment effectuates the sale or its containment at the point of delivery, inevitably means that production is in the hands of the Commission. Congress has posted this as off limits to the Commission. Only Congress may make the change.

I therefore respectfully dissent.

Rehearing denied: JOHN R. BROWN, Circuit Judge, dissenting.