UNITED GAS PIPE LINE COMPANY,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 21693.

United States Court of Appeals
Fifth Circuit.

Sept. 8, 1965.

Rehearing Denied Oct. 8, 1965.

Vernon W. Woods, Willis L. Meadows, Shreveport, La., for United Gas Pipe Line Co.; Wilbert O. Crain, Saunders Gregg, David Klotz, Wilkinson, Lewis, Woods & Carmody, Shreveport, La., of counsel.

Jack D. Head, Houston, Tex., for Texas Eastern Transmission Corp.; Keith M. Pyburn, Washington, D. C., Joseph F. Weiler, Bolivar C. Andrews, Houston, Tex., of counsel.

Bruce R. Merrill, Lloyd F. Thanhouser, Tom Burton, Houston, Tex., for Continental Oil Co.

Josephine H. Klein, Atty., Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., Robert L. Russell, Asst. Gen. Counsel, Peter H. Schiff, Atty., F. P. C., Washington, D. C., for respondent.

Before BROWN and GEWIN, Circuit Judges, and KILKENNY,* District Judge.

JOHN R. BROWN, Circuit Judge:

█ The question here is whether on expiration of the underlying gas sales contract with the seller still committed under the Natural Gas Act, the pipeline purchaser may be compelled to take deliveries at unilaterally increased prices until such time as the FPC approves abandonments. The FPC gave an affirmative answer. We agree and enforce.

Although decision is far from easy, the facts out of which the problem emerges are simple, neither complex nor conflicting.

In January 1953 Producer [1] and Pipeline [2] contracted for the sale and purchase of gas from Producer's Johnson Bayou Field, Louisiana. This contract was for a primary term of ten years from January 31, 1953, and was subject to termination after the primary term upon notice by either party. During the term of the contract the specified contractual rate was 10.077¢ per mcf including tax reimbursement. The contract was filed with the FPC and accepted as Producer's Rate Schedule No. 115. Producer sought and obtained a certificate of public convenience and necessity authorizing the sale of gas to Pipeline in accordance with its filed rate schedule (of which the contract was the embodiment) and commenced initial delivery of gas on January 31, 1955.[3] Pipeline also sought and obtained a certificate of public convenience and necessity authorizing the construction of facilities necessary to take the gas from Continental.[4] Both Producer and Pipeline did in fact construct facilities in Johnson Bayou Field to permit the sale, purchase and taking of such gas. The Johnson Bayou gas comes from two wells completed on Producer's lease in the field. The facilities installed by Producer were more extensive [5] than those of Pipeline.[6] The delivery point of the gas is located at a valve at the juncture of Producer's 2½ inch flow line and Pipeline's 4 inch pipeline. These facilities were used continuously for delivering and taking the gas from the time of initial delivery on January 31, 1953, until Pipeline shut off the valve and ceased taking gas on January 31, 1963.

As permitted under the contract, within ninety days prior to the expiration of the primary term of the contract, Producer gave notice to Pipeline of termination of the contract at the end of the primary term. This notice of termination was acknowledged by Pipeline. The contract expired according to its terms on January 31, 1963. Producer's effective rate schedule was not terminated, however.

---

* Of the District of Oregon, sitting by designation.

1. Continental Oil Company.

2. United Gas Pipe Line Company.

3. Producer was issued a certificate for this sale at Docket G-6949.

4. Pipeline was issued a certificate by the Commission at Docket G-2818 on February 25, 1955 in United Gas Pipe Line Co., 14 FPC 582, "authorizing the continued transportation of natural gas by [United] in interstate commerce" and authorizing "the construction and/or operation of any facilities used for the transportation or sale of natural gas in interstate commerce" by United.

Field facilities are characterized by FPC as "purchase facilities" in its Rules (18 CFR § 2.58) and Regulations (18 CFR § 157.7).

5. They comprised approximately 4,400 feet of 2½ inch flow line, two separators and a battery of storage tanks near the separators.

6. They were 55 feet of 4 inch pipeline leading from Producer's flow line to Pipeline's Mud Lake transmission line, and also a separator and meter station. The initial installation cost was about $7,000.00.

During the last months of the contractual term, Producer and Pipeline endeavored to negotiate a new contract. These negotiations were unsuccessful. In brief, Pipeline's position was essentially an offer to extend the old contract either on a relatively long-term basis at the same price and other terms, or, on a day-to-day basis at the same price and other terms. Producer sought a new long-term contract with an increased price reaching 18.75¢ mcf but within the range of the applicable current South Louisiana price level under General Policy No. 61–1 for "old" gas. When negotiations broke down, Pipeline advised Producer that it did not need the gas, and that it would support an application by Producer for abandonment of the certificate. Producer declined and gave the notice of termination.

After giving notice of termination, Producer filed in December 1962 a notice of change in rate pursuant to § 4(e) effectuating a unilateral change in rate under its Rate Schedule No. 115 effective January 31, 1963. This provided for an increased rate to 15.75¢ per mcf including tax reimbursement.[7] Producer's existing rate schedule remained effective and unchanged in all other respects.

FPC accepted the rate change to become effective without suspension. Although Pipeline opposed the filing of the unilateral rate change and unsuccessfully sought rehearing of the approval order, Pipeline did not take timely review of this order. The order permitting the rate increase to become effective thus became final.[8]

On learning of the final order approving the rate increase, Pipeline notified Producer just two days prior to the expiration date (January 31, 1963) that it would not continue to purchase gas from Johnson Bayou Field after that date. Pipeline did not request permission from FPC to cease operating the facilities used in taking gas or to abandon the service, or the purchase, transmission and resale of Johnson Bayou gas. In accordance with its notice, Pipeline ceased taking the gas on January 31, 1963.

Almost immediately Producer petitioned the FPC to direct Pipeline " * * to show cause why it should not be required to continue to take deliveries of gas produced * * * in the Johnson Bayou Field * * * at the currently filed and effective rate * * *." Declining this relief, the FPC did direct Pipeline to show cause "why it should not be required to apply for and obtain the permission and approval of the * * * Commission before ceasing the operation of all or any portion of the facilities heretofore operated by [it] to purchase natural gas from" the Producer. After a hearing the Examiner's initial decision dismissed the show cause order, but on review and oral argument, the Commission,[9] by divided vote,[10] in an opinion by Commissioner O'Connor held that the Pipeline's refusal to make any use, for an indefinite time, of the facilities for the purchase of gas constituted an abandonment under § 7(b) and it ordered Pipeline to resume purchasing gas at the rate specified in Rate Schedule No. 115.

There was great reoccupation with cessation.[11] Undertaking to answer the attacks which are reiterated here by the Pipeline [12] and stressing the importance

7. This rate did not exceed the applicable area rate level for South Louisiana under AR 61–1. See § 2.56, 18 C.F.R. (Cum. Supp.1964) 2.56.

8. Continental Oil Co., 29 F.P.C. 525, 526.

9. Opinion No. 426; 426A, 31 F.P.C. ——.

10. The late Commissioner Woodward dissented.

11. E. g., the question as posed by the FPC was: " * * * whether the

cessation of gas purchases with the concommitant nonuse of jurisdictional gas purchasing facilities, where there is no present intent to renew such purchases, constitutes an abandonment within the scope of" § 7(b). (Emphasis supplied)

12. As an ally it is joined by Texas Eastern Transmission Corporation, an intervenor, on both brief and argument.

of § 7(b),[13] the opinion emphasized that this section "frames the relevant issue, not in terms of whether this Commission has the power to compel continued purchases, but whether the 'public convenience and necessity' dictates that pipe lines *cease* purchasing * * *." (Emphasis the Commission's.)

But it seems quite clear that the FPC hardly thought that the impact of its decision was any different by casting it in terms of a requirement that permission be obtained to *cease* performance rather than an order *compelling* continuation of an activity. Thus, describing the contention that although the producer must continue to sell while the Pipeline-Purchaser need not buy, as "paradoxical results" to which "we cannot subscribe," the FPC concluded "that if the power to compel the continuation of sales is not to be reduced to mere illusion, the power to *compel* the continuation of purchases must be its correlative." And in ordering Pipeline "to renew the use of these facilities," pending an abandonment proceeding,[14] Pipeline was ordered to make "purchases * * * at * * * [the] currently effective filed rate, and in volumes consistent with the terms of the previously effective contract."

Stressing that by this decision the FPC "for the first time in the history of the * * * Act orders a pipe line: (1) to purchase gas; (2) to pay an increased price fixed unilaterally by the seller; and (3) to buy volumes controlled by a cancelled contract," Pipeline levels a broadside attack.

Pipeline takes the flat position that after the expiration of the sales contract, it cannot, under the Act, be compelled to continue purchases. Whether it continues is a volitional action of its own to be determined solely by it and on terms which it deems acceptable. And the FPC may not bring about this unauthorized result by treating discontinuance of gas purchases as an abandonment of physical facilities through which delivery of the gas has previously been effected. Indeed, the argument continues, the Act is so structured that on this eventuality Pipeline is to be considered as a prospective purchaser as to whom the FPC lacks power to prescribe initial rates. Underlying it all is the insistence that the *purchase* of gas is a non-jurisdictional activity and since the FPC may neither grant, not require application, for a certificate, for the purchase of gas, there is nothing the purchaser can abandon when the contract expires on its own terms.

In the analysis of these objections and the infinite variable shadings of them. some steps are easy, some not so easy. And in the process, we see again that the weapons of attack and defense are practically the same, each faction embracing now this, now that, opinion of the Supreme Court.

■■ Although without more we are not so sure just what the effect might be, we have no doubt that the FPC was authorized on this record to conclude that Pipeline's conduct was an abandonment of the physical facilities for delivery of the gas. Of course the facilities being essential to interstate transportation of gas, they were "jurisdictional," Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Indiana, 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128, for which a certificate was both required, § 7(c), and issued, § 7(e) (see notes 4, 6, supra). That these facilities were simple in nature and small in cost is of no conse-

13. § 7(b) provides:
"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permits such abandonment." 15 U.S.C.A. § 717f(b).

14. The opinon expressly recognized that the "order is without prejudice to the institution by [the Pipeline] of a formal abandonment proceeding."

quence. And whatever might be the status of parts of the equipment geographically more removed, it has been plain in this Circuit ever since Continental Oil Co. v. FPC, 5 Cir., 1959, 266 F.2d 208,[15] that the very last piece which effects the entry of the gas into the interstate stream is jurisdictional and not insulated from regulation by the production and gathering exclusion of § 1(b), 15 U.S.C.A. § 717(b). And see Ben Bolt Gathering Co. v. FPC, 5 Cir., 1963, 323 F.2d 610.

But, Pipeline insists, granting all of this, there has yet been no abandonment either in fact or in law since the facilities remain intact ready for operational use once there is a need for them. The law, however, is hardly that unrealistic. The facilities, it may be assumed, are maintained in good order ready for immediate resumption of use. But the use is to be on the terms, under the conditions and at the volitional desire of Pipeline. Once dedicated to the public use, the facilities are now withdrawn to the status of private property unburdened of the public interest or public regulation.

But this conclusion does not solve this case. A simple order to resume *use* of the facilities if complied with would, to be sure, resume the flow of gas—even unwanted gas. Further, the receipt of gas would impose, one would think, some character of obligation on the receiver to pay for it, perhaps measured by what it

is worth to the receiver—an obligation which, incidentally, Pipeline is willing to bear.[16] But here the order requires that Pipeline (a) take gas and therefore put facilities to use and (b) pay the rate prescribed unilaterally by Producer. Full recognition of a public duty clearly includes (a) but not necessarily (b).

It is at this point that all of the arguments, theories, and counter arguments, counter theories intertwine to justify a result different from the likely one had each been carefully compartmentalized.

Thus, one must acknowledge a good deal of force to Pipeline's contention that under Mobile [17] and Memphis,[18] initial rates are fixed alone by the contract[19] and this sales contract having expired, Pipeline's status is that of a *prospective* customer. Thus, the Court declared, the " * * * initial rate-making and rate-changing powers of natural gas companies remain undefined and unaffected by the Act." The rate provisions, the Court went on, simply define and implement " * * * the powers of the Commission to review rates set initially by natural gas companies, and there is nothing to indicate that they were intended to do more." Recognizing that a gas company under the Act may make, and change, contract rates, the Court summarizes this as the power " * * * to establish ex parte, and change at will, the rates offered to *prospective* custom-

15. We there expressly approved J. M. Huber Corp. v. FPC, 3 Cir., 1956, 236 F. 2d 550, cert. denied, 352 U.S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324.

16. Indeed, one might wonder what the position would have been had Pipeline, acquiescing in a mandatory order to resume taking, merely stated that for such gas it would pay such amount as found due by a court judgment in an action brought by Producer for goods sold and delivered. Cf. United Gas Pipe Line Co. v. Tyler Gas Service Co., 5 Cir., 1957, 247 F.2d 681; Tyler Gas Service Co. v. FPC, 1957, 101 U.S.App.D.C. 184, 247 F.2d 590; Tyler Gas Service Co. v. United Gas Pipe Line Co., 5 Cir., 1954, 217 F.2d 73.

17. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373.

18. United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.

19. Of course even the most intransigent anti-regulation-purist must recognize that this absolute, like most, is also unabsolute. For the right to fix the initial price is of little value unless the sale is certified thereby bringing into play the FPC's awesome power to reject out-of-line prices under CATCO (Atlantic Refining Co. v. Public Service Commission, 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312), condition a temporary, FPC v. Hunt, 1964, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878, 886, reversing, 5 Cir., 1962, 306 F. 2d 334, or perhaps even a permanent, Callery Properties, Inc. v. FPC, 5 Cir., 1964, 335 F.2d 1004, cert. granted, 1965, 380 U.S. 931, 85 S.Ct. 935, 13 L.Ed.2d 820.

ers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer." 350 U.S. 332, 343, 76 S.Ct. 373, 380.

To this the Pipeline can add the further weighty argument that the Act is carefully limited. Speaking of § 1(b), the Court early said, this "section determines the Act's coverage and does so in the light of the situation existing at the time. Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." Panhandle Eastern Pipeline Co. v. Public Serv. Comm'n of Indiana, 1947, 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128. There is in the Act no provision that a purchaser must, or even may, obtain a certificate to purchase gas. Its duties *vis-a-vis* a seller-producer are therefore solely a matter of the contract,[20] all such duties evaporating once it is extinguished.

But sound as all this literally may be, it does not reckon with the continuing obligation of the Producer-seller over and beyond the contract period even to the point of exhaustion of reserves. Paraphrasing CATCO, the Court in Sunray (see note 23, *infra*) described the situation:

" * * * An initial application of an independent producer, to make movements of natural gas in interstate commerce, leads to a certificate of public convenience and necessity under which the Commission controls the basis on which 'gas may be initially dedicated to interstate use. Moreover, once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval. The gas operator, although to this extent a captive subject to the jurisdiction of the Commission, is not without remedy to protect himself.' 360 U. S. at 389," [79 S.Ct. 1246].[21]

Of course, as a matter of *contract*, the seller-producer volitionally intends to sell for the life of the contract only. Likewise, as a matter of contract, the purchaser volitionally intends to buy for that period only. But whether the conceptual approach is that of Austin or of Blackstone,[22] the fact now is, as revealed by Sunray[23] and Sun,[24] both seller and buyer have to recognize, whether they know it or not, that the Act imposes a continuing obligation on the seller. If— and there is no real if—the Act imposes obligations beyond[25] the contract as to one party in order to achieve the aim of the statutory scheme, it hardly makes

20. The Pipeline carefully disclaims any right to take unilateral non-FPC approved action during the life of the contract. It never quite says why—because the contract, as a contract, is binding and independent action would be fruitless? or because by virtue of the Act performance under the contract generates, or releases, legal power in the FPC to regulate purchasers as well as seller for the duration?

21. 364 U.S. 137 at 156, 80 S.Ct. 1392 at 1403.

22. Linkletter v. Walker, 1965, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, 604–605 reversing, United States ex rel. Linkletter v. Walker, 5 Cir., 1963, 323 F.2d 11.

23. Sunray Mid-Continental Oil Co. v. FPC, 1960, 364 U.S. 137, 80 S.Ct. 1392, 4 L. Ed.2d 1623.

24. Sun Oil Co. v. FPC, 1960, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639, affirming, 5 Cir., 1959, 266 F.2d 222. In many ways this case transcends Sunray. For in Sun the question was not power to grant unlimited certificates, but whether the producer-seller was restricted to the old price under the expired contract.

25. We are dealing, of course, with the statutory obligation, rights, etc. Consequently, the fact that Congress as it did by the proviso of § 5(a) puts limits, or even prohibitions, on the exercise of regulatory power does not demonstrate an absence of a purpose to regulate.

sense in the divination of congressional purpose to assume that only one side of the transaction was to be subject to immediate, continuous, and perpetual obligation and regulation.

■ It is not forbidden judicial legislation to give Congress credit for desiring symmetry. Many signs point in that direction. One surely is the fact that regulation of long line transmission-pipeline purchases or carriers was a principal object of the Act to bridge the gap between permissible and nonpermissible local, state regulation. FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. And Mobile articulated what our own abundant exposure to the endless list of post-Phillips fall-out [26] cases teaches us, that contracts for the purchase of gas, usually long term and oftentimes in express terms of dedication of reserves, underlie the whole intricate structure of transcontinental lines.[27] What is so vital to financiers, entrepreneurs, and the FPC initially hardly becomes less so as the years go by. A marker in the opposite direction is, of course, congressional rejection in 1938 of proposals that the Act expressly identify purchasers as a category for regulation.[28]

But there are ample reasons to dispel any apparent inconsistency. A major factor may well have been a confidence that with the regulation prescribed including that on producer sales,[29] the public interest was adequately guarded under a scheme which simultaneously gave gas purchasers sufficient freedom of choice since it was—and still is for that matter—the sole volitional decision to *purchase* initially that subjects seller and buyer to duties transcending the contract. The buyer, as much as the seller, sets the machinery in motion.

Pipeline, far from fleeing before Sunray, urges strenuously that the Court inescapably envisioned the reverse situation —the one presented here—and predetermined that the purchaser is free to take or not to take or to take on its own terms. Pipeline finds this in the Court's emphasis on the elective nature of the buyer's actions. Thus, the Court stated, "During its term, both parties are bound by it to the same extent as any members of this regulated industry. When it expires, [seller], to be sure, will be under an obligation to continue to deliver gas to United [purchaser] on the *latter's request* unless it can justify an abandonment before the Commission * * *." This is re-

---

**26.** Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

**27.** See, e.g., 18 C.F.R. § 157 and particularly § 157.14(10):

"*Exhibit H—Total gas supply data.* A statement of the total gas supply committed to, controlled by, or possessed by applicant which is available to it for the acts and the services proposed, together with:"

   (i)   estimated proven reserves in place

   (ii)   estimated proven reserves available by fee or lease

   (iii)   gas purchase contracts

   (iv)   deliverability study

   (v)   conformed copy of each gas purchase contract

   (vi)   Btu content estimate

   (vii)   maps showing location, proven limits, acreage, gas volume pipelines to be utilized.

   (viii)

   (ix)   study of proposed gas storage fields.

**28.** Pipeline's brief points out that while Congress was considering the passage of the Natural Gas Act, a bill (HR 5711 and S 1919, 75th Cong. 1st Sess.) was introduced in both houses of Congress on March 17, 1937, which provided that "this Act shall apply to the procurement of natural gas for the purpose of its transmission through pipe lines and its sale, exchange, transmission, or distribution in interstate commerce * * *." The provisions of this bill, however, failed of adoption; instead Congress enacted Section 1(b) with its specific exemptions from the coverage of the Act. Cognizance was taken of this in FPC v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 513 n. 16, 69 S.Ct. 1251, 93 L.Ed. 1499.

**29.** This 1938 congressional purpose was discerned in 1954. Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

peated so it is urged, in the analysis of the newly declared Act-imposed, post-contract duties of the seller. The seller "* * * will be free then, as it was not free during the contract term * * * to make rate changes under § 4 without [purchaser's] consent. It is said that [seller] will be in a position of inequality, because it must supply gas then to United [purchaser] without a corresponding obligation on United to take it." Especially is this so since the pressures on the buyer are not those of the Act, but rather of the market place. For this the text is found in these words. "But United, subject to the Act in its sales to local distributors, has its obligations too; and if in fulfilling them it desires to have a continuing supply of gas with the stability of price protection which a contract furnishes under Mobile, it may be discovered that each side has its bargaining strength.

We do not believe the Court had any such purpose, but fortunately if what we say it said is not what it said, the instant case affords the vehicle for resolution, 28 U.S.C.A. § 1254. First, the Court was analyzing again the Mobile-Memphis concept of integrity of contract. Next, it was dealing with the obligation of the seller-producer, not the purchaser. Also, one of the emphasized statements from the Court's opinion follows on the heels of the ambiguous phrase "it is said" as though, perhaps, the Court was seeking to answer an argumentative contention, not canvass factors or declare legal principles.

But we would not approach it so narrowly. We think that in at least two respects, the opinion in Sunray necessarily contemplates that the purchaser is subject to the restraints of the Act after the expiration of the sales contract. There is first, the Court's consideration of the resulting predicament if expiration of the contract were held to extinguish the regulatory power of the FPC. Such a result, it pointed out, would bring into operation the right of the seller, as a part of a new certificate, to file rates for the "new" service under § 4(c). This would leave the FPC with nothing but the awkward, time-consuming and reverse burden of proof of a § 5 proceeding. But if the seller were still obligated, the Court went on, "* * * the rates to be charged under a new contract or otherwise would have to be filed as rate changes under § 4(d) of the Act, with 30 days' notice to the commission and the public." This would permit not only suspension, § 4(e), but at the hearing the seller "* * * would have to shoulder the burden of proving that its new rates were just and reasonable." This led the Court to conclude, "* * * Clearly, the rate change provisions of §§ 4(d) and 4(e), rather than the 'initial rate' provisions of § 4(c), are better tailored to the situation that exists when an initial contract of sale of natural gas terminates, and the supply of gas continues." Unlike a really "new" service as to which "* * * the protective provisions of §§ 4(d) and (e) * * * are not relevant," this is "not the case where one sales contract expires and service continues" for in that event, "the protective provisions fit as well as they do in the case of a rate change made pursuant to a contract, during its term." 364 U.S. 137, 144–147, 80 S.Ct. 1392, 1397, 1398.

But more direct was the Court's consideration of the term "service" as used in § 7(b) and § 7(e). The Court's analysis followed these steps. First, "* * * under § 7(e) the Commission is authorized to issue a certificate authorizing the 'service' covered by the application as well as a 'sale.'" Next, § 7(c) sets "forth no specific antecedent for the 'service' to which § 7(e) refers." Consequently, "it might well be thought that one who 'engage[s] in the transportation or sale of natural gas,' which § 7(c) does refer to, is performing a 'service' within the meaning of § 7(e). Certainly there is no more likely antecedent in § 7(c)." Added proof was found in § 7(e) and its certification requirement of a dual finding "that the applicant is willing and able 'to do the acts and perform the service proposed.'" Consequently, the Court declares, "§ 7(e) itself gives positive indication that

the 'service' which the Commission's certificate may authorize is something quite apart from simply the specific sales which § 7(c) forbids without a certificate sufficient to authorize them. * * *." [30] 364 U.S. 137, 144, 146–147, 80 S.Ct. 1392, 1400.

Blending these two approaches—(1) reliance on § 4(d) and (e) and (2) "service" encompassing "sale" and vice versa—it is inconceivable that the Court could have been treating the seller as subject to awesome regulation at a time the other necessary party to the activity was scot free. Thus, for example, under the structure of § 4, a certificated seller may charge only the filed rates. Using, as Sunray requires, § 4(d) and (e), the FPC must determine the "lawfulness" of the rate, whether suspended or not, since all rates—initial under § 4(c) or changes under § 4(d) and (e)—must meet the "just and reasonable" standard of § .4(a). It is incongruous to suppose that the regulatory agency charged by Congress with achieving the objectives of this legislation is to fulfill this role by a perfunctory stamp of approval on a rate submitted by a seller under the pressure of a freewheeling and independent purchaser on a take-it-or-leave-it basis. And since, for § 7 purposes, "service" includes "sale" and vice versa, each of the two parties to a sale—seller and purchaser—necessarily are performing that kind of service. The purchaser's part in a sale, certainly of gas, is vital. It must take it and it must pay for it. And equating "service" with "sale", it, like the seller, has an obligation both to (a) take and (b) pay that transcends the contract.

This discussion of Sunray demonstrates, we think, that Pipeline is incorrect in urging that without certification of the purchase or certificating the purchaser there is no duty of one subject to the Act to obtain FPC permission before abandonment of one side of the jurisdictional sale. The "service" is rendered by seller and buyer, and each must serve on until excused under § 7(b).

Other things likewise point away from the proposition that the FPC's power to require abandonment is equated with the power initially to certificate. As the brief for the FPC points out as originally enacted in 1938, certification was required only for a proposed entry into an area already served.[31] The legislative history reflects a congressional awareness of the need for an effective abandonment procedure.[32]

The price to be paid for gas is important. Indeed, in most of the cases, this seems to be the predominant factor. But the supply of gas is equally important. Callery Properties, Inc. v. FPC, 5 Cir., 1964, 335 F.2d 1004, 1012–1013, cert. granted, 1965, 380 U.S. 931, 85 S.Ct. 935, 13 L.Ed.2d 820. And it is for the FPC, at least initially, to strike the balance on price and supply in fulfilling its statutory role in determining whether the gas "is or will be required by the present or future public convenience and necessity," § 7(e). Withdrawal of gas from the interstate market which the producer is mandatorily required to make available because the purchaser, for its own economic reasons, concludes the price is too high shifts from the governmental agency to a private interested party the determination of this critical problem of the needs of the public, not alone for today, but for the explosive tomorrow. Detroit & Cleveland Navigation Co. v. United

---

30. See also 364 U.S. at 162–166, 80 S.Ct. 1392. Justice Harlan dissenting, recognized that service did encompass things other than sales or transportation, and that the obligations of a pipeline are continuing and not limited by contract.

31. This was amended 1942, 56 Stat. 83. See FPC v. Texaco, Inc., 1964, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112.

32. See, e.g., hearings on H.R. 11662, 74 Cong.2d Sess., at p. 92; the House Committee rejected a proposal that abandonment be allowed "without obtaining such permission, approval or finding, if service is not thereby impaired or if substitute facilities will be installed." See hearings on H.R. 4008 before House Committee on Interstate and Foreign Commerce, 75 Cong.1st Sess. at p. 127.

States, 1945, 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38.

 Holding, as we do, that the FPC has the power and the duty to require that it approve any abandonment of this service by Pipeline, we can briefly dispose of the remaining contentions.

Although it is probable that the impression comes from Pipeline's arguments designed to show that the FPC on brief and argument here is attempting to confine the issue to the necessity for a § 7 (b) permission to *cease* purchasing of gas rather than the intrinsic question of an order affirmatively requiring taking of gas at an increased unilateral rate, there is a possible suggestion that the issues were inadequately defined from a procedural standpoint. We think there is nothing to this. All parties were fully informed of what was at stake.

Objections that the record evidence does not justify the FPC's implied conclusion that the order under attack is needed to preserve the status quo are really premature. All that the order holds is that pending determination on Pipeline's application for a § 7(b) abandonment, Pipeline must continue to take and pay the only outstanding (and hence lawful) rate. The FPC for ample reason declined to consider the intrinsic merits of that problem until the abandonment application is filed.

This likewise takes care of Pipeline's assertion that this is an unconstitutional deprivation of its property without due process. All of these issues bearing upon Pipeline's need, the public's need, the reasonable need so far as price is concerned are all matters for consideration in the abandonment proceeding. For all we know, once the FPC's power is established as it is done here, Pipeline may find itself now surrounded by energetic local distributor intervenors as new allies urging the FPC to require abandonment because the Producer's rate is too high. See, United Gas Improvement Co. v. Continental Oil Co. (FPC v. Marr), 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466, reversing 5 Cir., 1964, 336 F.2d

320. The FPC may be persuaded and confiscation will also evaporate.

This leaves only the tag end that the order, authorizing a unilateral change in increase in rates, holds the Pipeline's feet to the fire as to the other terms and conditions of the expired contract. To the extent that this really presents a problem, it, too, can be the subject of a factual inquiry and conditional order on the abandonment proceedings.

Order enforced.