Fanny Fern WEYMOUTH and husband,
C. E. Weymouth, et al., Appellants,

v.

COLORADO INTERSTATE GAS COM-
PANY, Appellee.

COLORADO INTERSTATE GAS COM-
PANY, Appellant,

v.

Fanny Fern WEYMOUTH and husband,
C. E. Weymouth, et al., Appellees.

No. 21096.

United States Court of Appeals
Fifth Circuit.

Sept. 20, 1966.

D. H. Culton, B. M. Britain, L. A. White, R. W. Richards, Amarillo, Tex., Culton, Morgan, Britain & White, Amarillo, Tex., of counsel, for appellants.

A. J. Folley, Folley, Snodgrass, Calhoun & Kolius, Amarillo, Tex., James L. White, Denver, Colo., Lewis M. Poe, Robert R. McCracken, Colorado Springs, Colo., James T. Moran, Denver, Colo., Holland & Hart, Denver, Colo., of counsel, for appellee.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

As with another case this day decided,[1] this one, thought by the parties to be a private controversy, turns out to have transcendent public interest issues. In each, besides deciding the private law questions, we direct a reference to the Federal Power Commission for it to determine under the doctrine of primary jurisdiction the jurisdiction of the FPC over rates to be paid for gas royalty.

This appeal by both sides is from a contest between Lessors, the owners of the royalty interest on the 100,000-acre Masterson ranch located in the middle of the gas-rich West Panhandle field near Amarillo, Texas and Lessee-Pipeline, the producer-pipeline purchaser, Colorado.[2]

### The Litigation

The complaint[3] is that for the period 1957–1960 (1) Colorado underproduced the lease by failing to market the gas and (2) its royalty payments for the gas taken did not come up to "market value," the standard required by the terms of the lease. There have been two trials. The first resulted in a jury verdict that (a) Lessee-Pipeline had failed to exercise diligence in marketing and producing Masterson gas (b) in the

1. J. M. Huber Corporation v. Denman, 5 Cir., 1966, 367 F.2d 104.

2. Colorado Interstate Gas Company.

3. Lessors also asserted three additional grounds relating to lack of diligence in developing certain properties, but these were severed for separate trial and are not in any way before us.

amount of 4.5 to 5 billion cubic feet[4] for each of the five years,[5] but (c) that the prices paid by Lessee-Pipeline[6] were equivalent to "market value"—thus a victory for the Lessors on (1) under-marketing and for Lessee-Pipeline on (2) price.

A new trial on the issue of market value was granted on Lessors' motion. This was because one of Lessee-Pipeline's witnesses, whom the Court was led to believe would be—but never was—qualified as an expert, had been allowed to give extensive testimony on compara-ble gas sales—all based on hearsay. In the second trial the jury found a differ-ent market value for each of the years[7] which had the effect of stepping up Les-sors' judgment to $242,674.88 plus inter-est.

The appeal by the Lessors attacks the market value finding of the second trial.[8] It presents in multi-issue form and me-ticulous detail the contention that the Trial Court erred in admitting certain defense exhibits and allowing supportive and explanatory expert testimony con-cerning other West Panhandle field prices paid for gas, either in the form of royalty payments or contract sales between producers and pipelines. Les-see-Pipeline's more broadly based appeal asserts that the trial Court improperly granted the motion for new trial, but al-so as a defensive matter it hastens to the trial Court's side—urging the cor-rectness of the evidentiary rulings in the second trial. As to the underproduction failure to market finding in the first trial, Lessee-Pipeline maintains that it nominated and produced all it could un-der the applicable Texas Railroad Com-mission regulations and that this is a complete defense. Secondarily, on this point it insists that the evidence is insuf-ficient to support the finding of lack of diligence. It also urged that the Fed-eral Power Commission has primary ju-risdiction over any demand for a higher price including that paid, in effect, as royalty.

Post argument consideration led the Court to the view that in the ultimate resolution of private law issues, there were problems of great public interest. The Court by memoranda to counsel in this and *Huber* (see note 1, supra) called for, and we have received, extensive help-ful briefs.[9]

---

4. Throughout we use:
 Billion cubic feet: bcf
 Million cubic feet: milcf

5. The jury found that by the exercise of diligence, Lessee-Pipeline would have pro-duced and marketed these additional amounts:

| Year | bcf |
| --- | --- |
| 1957 | 4.7 |
| 1958 | 4.5 |
| 1959 | 5.0 |
| 1960 | 4.6 |
| 1961 | 5.0 |

6. Lessee-Pipeline paid:

| Year | Per mcf |
| --- | --- |
| 1957 | 10¢ |
| 1958 | 10¢ |
| 1959 | 12¢ |
| 1960 | 12¢ |
| 1961 | 12¢ |

7. On the second trial the jury found "mar-ket value" to be:

| Year | Per mcf |
| --- | --- |
| 1957 | 10.42¢ |
| 1958 | 10.86¢ |
| 1959 | 11.30¢ |
| 1960 | 11.74¢ |
| 1961 | 12.05¢ |

8. See note 7, supra.

9. These included the formal brief of the FPC (with separate statement of Com-missioner O'Connor) filed in response to the Court's express request and full ex-change of briefs of all counsel in both cases on the FPC issue. In *Weymouth* our memoranda sought and we received extensive supplemental briefs and mate-rials pertaining to the Texas gas prora-tion, nominations, allowables, etc. in de-termining whether, and how, the added volumes fixed by the jury could have been produced. (See Part III.)

## I.

### The Partial New Trial

We deal first with the propriety of the Court's granting a new trial on market value. Lessee-Pipeline's witness Melton testified and sponsored exhibits purporting to show the average purchase price being paid by other interstate pipelines in the West Panhandle field. This was hearsay information, but permissible when adduced by an expert to show the basis for his opinion. International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201, 208; Hays v. State, Tex.Civ.App., writ ref'd, 1960, 342 S.W.2d 167. Although Melton had all of the background experience to qualify him as an expert and the trial Court expected that on this he would be asked to state formally an opinion based upon all of this data, this was never done. Looking backward as a motion for new trial requires, the Judge could see that there was no justification for the hearsay evidence. The trial Judge therefore properly considered this inadmissible. Lessee-Pipeline, however, asserts that the new trial was granted on the Judge's own motion out of time (5 months after date of judgment) when the Judge was without jurisdiction under the then 10-day requirement of F.R.Civ.P. 59(d).[10] We do not reach this question because after full consideration of the testimony, objections of counsel and the Lessors' motion for new trial, timely filed under 59(b), we have concluded that this matter was fairly before the Judge in the Lessors' motion. The Judge therefore had continuing jurisdiction and did not abuse his discretion in granting a new trial on market value.

## II.

### Market Value Proof

This brings us to the Lessors' appeal challenging evidentiary rulings.

The broad problem of what kind of evidence may be used to establish the market value of the gas presents no difficulty, for the easy answer is that, among other ways, it may be established by expert opinion. Another rule which both parties accept is that laid down in condition II of Hays v. State, supra:

> "Evidence of sales of *comparable* properties may be offered under three conditions: * * * (II) on direct examination of the value-witness to give an account of the factual basis upon which he founds his opinion on the issue of value of the [property] in controversy, * * *." 342 S.W.2d at 170.

Agreeing with this general statement, essentially Lessors assert that Lessee-Pipeline's experts, in preparing exhibits to be shown the jury and in testifying as to what factors they considered in arriving at their conclusions, took into consideration and were allowed to testify about transactions other than "comparable" sales. This objection, of course, went to both the exhibits and the back-up testimony. The main complaint relates to the use of royalties paid by the other interstate pipeline companies in the field. The defect here, say the plaintiffs, is that these payments, unless fixed in the lease, are not the result of arms length bargaining; they represent only what the pipeline chose currently to pay and were not even binding on the recipient royalty owner who like the Masterson owners might elect to go to court, as they often did (and do). Thus they are not competent to show "market value"[11] which the Court, with the approval of the Lessors, defined in its charge as:

> " * * * that price which a willing buyer would pay and a willing seller would take, after fair negotiation, with neither party acting under compulsion."

10. See Amended F.R.Civ.P. 59(d) effective July 1, 1966; this eliminates the conflict of court rulings, 39 F.R.D. 69, 121.

11. The relevant provision of the governing "New Consolidated Lease" on the Masterson ranch, dated 1955, recites:

> "(a) Lessee shall pay to Lessor for all natural gas produced, saved and sold. from the lands covered by this lease a royalty of ⅛th of the market value at the mouth of the wells for all gas produced, * * *."

■ Although *no exception was taken* to this charge, and no error is here asserted, a consideration of it does at least two things. First, it reveals that for this business—the gas business—the charge is woefully over simplified to the point of inaccuracy. And, second, the deficiencies of it reveal the factors, multiple and complex, which are relevant in determining market value of gas sold for resale in interstate commerce as all —or substantially all—of this gas is.

Of course, in this special application the test can still use the fictional willing "buyer" and "seller." But from that point on there must be increasing emphasis on those restraints which more and more circumscribe that "freedom" to make the phantoms less and less "willing."

The law must take account of the fall-out of *Phillips I*.[12] That means that while the inquiry might be: what would a willing seller and buyer pay?, the circumstances of that fictional negotiation must reckon with the nature of this business. It is in no sense a "free" market. The usual "free, willing" negotiators contemplate a contract binding on each and enforceable as the bargain made. But this is only partially true for gas sales FRIC.[13] The seller, for example, is bound, not for just the contract term. He is bound for the life of the reserves unless the FPC allows an abandonment.[14] The buyer likewise is, or may be, bound to take way beyond the contract term under administrative compulsion that perhaps even permits the seller to fix the new price.[15] Moreover, the parties are circumscribed as to what they may agree *on* or to *do*. Thus, contracts containing certain types of escalation, favored nations, etc. clauses never get to first base —the sale may not be consummated because never certified and never certified because the contract with forbidden clauses may not even be filed with the FPC.[16] And as to contract terms which are administratively permissible in scope or nature—or, more likely, were included in pre- or early post-*Phillips I* contract filings—it is almost certain that these never will be given effectiveness. Thus, rate increases from automatic stepped up, escalation or similar contract provisions are scarcely more than "an invitation to a dance." The law treats them as a "rate" increase triggering § 4 of the Act.[17] As such, they are subject to 5 months' suspension and collection thereafter under bond subject to refund. Even then, the burden is heavy on the proponent of the-thought-to-be-contractual-increase to show that the rate is fair, just and reasonable, is "in-line," will not trigger "out-of-line" prices, does not exceed area rate limits for new (or old) contracts or such other standards as are being invoked.

But it does *not* end there. It may not end because maybe it never begins. Thus before the so-called "free" sale can be consummated and the first cubic centimeter pass through the little jurisdictional valve[18] on its way to the Brooklyn burner tip, the contract has to be filed and a certificate of convenience and necessity obtained from the FPC. The contract, in that process, is subjected

---

12. Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

13. FRIC: for resale in interstate commerce.

14. Sun Oil Co. v. FPC, 1960, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639, affirming, 5 Cir., 1959, 266 F.2d 222.

15. The FPC has, in effect, so held, as have we in upholding their order in United Gas Pipe Line Co. v. FPC, 5 Cir., 1965, 350 F.2d 689, but in which the Supreme Court has granted certiorari, 1966, 383 U.S. 924, 86 S.Ct. 930, 15 L.Ed.2d 844.

16. FPC v. Texaco, Inc., 1964, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112.

17. Sun Oil Co. v. FPC, 5 Cir., 1959, 266 F.2d 222; Bel Oil Corp. v. FPC, 5 Cir., 1958, 255 F.2d 548, cert. denied 358 U.S. 804, 79 S.Ct. 47, 3 L.Ed.2d 76.

18. Continental Oil Co. v. FPC, 5 Cir., 1959, 266 F.2d 208.

to the closest scrutiny. Ever since *CATCO*,[19] the FPC has the power, indeed the duty, to reject it if the price is "out of line," and under *Callery*[20] it can condition the grant of permanent certificates on relinquishment of contract escalation rights, imposition of moratoriums on price increases, a built-in ceiling on increases and refunds down to the FPC post-contract prescribed "in-line" level.

Thus the striking of the bargain by the willing seller and buyer may possibly never result in an effective contract. At most it is an agreement that the parties will if—but the if is a big one. For the if is, that the parties will sell and buy if the FPC approves.[21]

To all of this must be added the further fact that to meet practical, if not legal, requirements, contracts for sale of gas FRIC must be for long periods of time[22] and generally for huge quantities.[23] It is true, of course, that to assure the supply of gas to meet the demand, the contract plays a role under the Natural Gas Act quite different from that for other utilities, but from all that has happened since *Mobile*, it is plain that such contract and continued operation under it is seldom free from the closest scrutiny and regulatory power of the FPC.

■ So this "free," "willing" buyer is not so "free." Nor is his counterpart, the seller. Nor is the commodity. Nor is the business. Nor is the sale. The test in capsulated form is then, what would a willing seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity.[24]

■ Lessors, largely ignoring these inescapable facts of life of the gas FRIC business, would force a hard line on comparability. They would almost, if not altogether, confine the expert to only those leases calling for "market value" entered about the same time and place as the Masterson lease. They would allow use of payments made under "market price" or other such typical lease standard only where it is first shown that there is no market value and a situation exists where a court would resort to other methods of arriving at some "fair" or intrinsic value. This view is too restrictive for the situation of an expert wit-

---

19. Atlantic Ref. Co. v. Public Service Comm., 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312.

20. United Gas Improv. Co. v. Callery Properties, 1965, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284; reversing in part, 5 Cir., 1964, 335 F.2d 1004.

21. The post-*CATCO* reversals by the 3rd, 5th, 9th, 10th, and D.C. Circuits (see list in Callery, note 20, supra, 335 F.2d 1008, n. 6) shows that the parties must reckon with what reviewing courts will do to their "bargain."

22. United Gas Improvement Co. v. FPC, 5 Cir., 1965, 350 F.2d 689, 695 and n.27; 18 C.F.R. § 157.

23. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S. Ct. 373, 100 L.Ed. 373; United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.

24. Ironically, the jury might then become the Judges. Inevitably, it has to determine:

(a) Whether the FPC would have approved the sale if made at the price sought (17¢) or any lesser sum or fixed by the verdict (12¢); and
(b) Whether the reviewing court would approve?

As to the theoretical sales in 1957, 1958, 1959 for the price sought (17¢) by Lessors, the jury would perhaps have to determine whether any of the five Courts of Appeals which struck down 21 to 23¢ prices in the post-*CATCO* cases (see note 21, supra) would have sustained 17¢ or lesser figure for West Panhandle. Indeed, although the most recent sales ordinarily would be the best proof of the so-called market in this peculiar business, it might turn out to be the most suspect. See *Callery*, supra, 335 F.2d 1004, 1012, n. 22.

ness explaining his opinion.[25] Lessors' heavy reliance on the *Sartor*[26] cases (note 25, supra) would bind upon us and all experts the rules applicable to introduction of direct evidence of comparable sales. This is simply unrealistic where we deal with an expert who, once he establishes his qualifications and he gives his broad, general opinion, needs to be able to reveal the basis for his opinion in his own language *without too many communication-crippling legal barriers thrown in his way.*

■ As the trial Judge explained, none of these sales (or royalty payments) are ever exactly comparable. The experts testified that under all the circumstances, in their judgment, the prices they utilized were fairly comparable. Royalty prices had been increasing due to the sharp incline in gas prices of which we are judicially aware,[27] and there was expert testimony that this was due in part to hard bargaining by large, knowledgeable and powerful royalty interests. From this point, objections against uncomparable sales, irrelevancies and unreliable hearsay went to the weight which the jury, whose attention was properly channeled by frequent guiding instructions and the charge, should attach to the expert's opinion, and the protection to the other side as has always been true under our system was cross examination.

■ We hold the same as to Lessors' other contentions, made in like genre, that exhibits and explanatory testimony of well head purchases by pipelines should have been excluded because many of the prices were fixed in contracts entered years earlier and were thus "too remote" for fair comparison. Also attacked was direct expert testimony on a non-well head sale with price adjusted downward to account for the cost of transportation. This, too, went to weight.

We are greatly strengthened in these conclusions when we look to the intense care given this very problem by the trial Judge. His awareness of all the relevant cases and considerations was shown in the first trial, when growing out of his alertness for the proper handling of expert testimony, he granted a new trial. In a pre-trial conference before the second trial, counsel were given every opportunity to develop and discuss fully and informally the evidence problems to be encountered, the very exhibits now challenged were examined and discussed, and at the conclusion the Judge outlined

25. The *Sartor* cases (Arkansas Natural Gas Co. v. Sartor, 5 Cir., 1935, 78 F.2d 924; Sartor v. United Gas Public Service Co., 5 Cir., 1936, 84 F.2d 436; Sartor v. Arkansas Natural Gas Co., 5 Cir., 1943, 134 F.2d 433), out of which Lessors would bleed this rigidity, do not point the way to a contrary result.

26. Of these cases we have several comments. First, we find much basis for Judge McCord's dissenting remarks: "I do not contend that decisions in these cases [Sartor] are wrong. I desire only to point out that our opinions as to the evidence necessary to disclose fair market value, which is the important and controlling issue in nearly every one of these cases, seem to have been confusing and misleading." Phillips Petroleum Co. v. Bynum, 5 Cir., 1946, 155 F.2d 196, 200 (dissenting opinion). Next, with *Phillips I* and its wake *so much gas has flowed through the judicial pipelines that there is little resemblance today to the free-wheeling opera-* tions of those unregulated times. Also, F.R.Civ.P. 43(a) has given Federal Courts great and needed flexibility in the receipt of evidence. Monarch Ins. Co. of Ohio v. Spach, 5 Cir., 1960, 281 F.2d 401, 409–411; Arrowsmith v. United Press Intl., 2 Cir., 1963, 320 F.2d 219, 236, 6 A.L.R. 3d 1072; Dallas County v. Commercial Union Assur. Co., 5 Cir., 1961, 286 F.2d 388, 393. Also we do not read these cases as narrowly as Lessors. Admissiblity of proof of other sales is not confined to those instances in which there is *no* market and the inquiry is the "fair" value of the gas. Here, clearly there is a "market" but the question is, in a business in which gas is sold under long term commitments, *what is the current price which* theoretically it would bring? Gas sales contracts would seem to be the best, not the most suspect, proof provided, as the witnesses did here, they showed a business, practical comparability.

27. See, e.g., note 21, supra.

the manner in which he intended to exercise his discretion in admitting exhibits and allowing testimony.[28] Liberality in admitting these exhibits and allowing explanatory testimony was to be matched with permissive and full cross examination.[29] Counsel were also given an opportunity to make suggestions with regard to the content of the charge. And throughout the trial the Judge was diligent in giving guiding and limiting instructions. On the first day of trial, at the first occasion, the jury was carefully instructed as to how they should receive and weigh this expert back-up testimony.[30] The jury was referred back to this instruction on numerous occasions. And this was capped by a full and fair charge spelling out in great detail the law's requirements on comparability.

▄▄▄ In the final analysis comparability is a fact. Is it green? Or yellow? More yellow than green? Seldom can Judges have so much—or more accurately *that* much—knowledge about a business or an activity as to be able to lay down hard and fast lines. This is an element of the expert's knowledge (and opinion). So it is ordinarily a matter

---

28. " * * * I will give strong cautionary instructions to the jury. * * * I will be inclined, particularly on the oral testimony, to exercise my discretion in favor of letting the witness show fully the matters that he is taking into consideration in arriving at his opinion as to the value. When I say 'fully', I mean limited by reason and limited by the rules in the International Company case and the Hays case, etc. But I don't want the jury to get off into the position where they will think this matter can be determined by hearsay testimony as to the price. It comes into actual evidence that is admissible, other prices not based on hearsay that are comparable situations; then the jury will have the right to take those into consideration."

29. "The Court:
"Well, of course, I think if an expert bases his opinion on matters of that kind the jury is entitled to know it. Of course, that really helps the party cross-examining him. So he is going to bring it out on cross-examination anyway. That is the reason I said a while ago the rule is much stricter when you go to offering primary evidence on price. * * * I don't have near the discretion, or near the latitude to admit that kind of evidence. The factor you are talking about now would come nearer making the evidence inadmissible than it would if some expert came in and said he took into consideration a transaction of 20 years ago and so forth and so on. Of course, the party offering it is hurting himself when he offers that, because if he [does not] bring it out, they will bring it out on cross-examination anyway, showing his opinions are out-of-date. And I would exercise my discretion, as I said a while ago, where there is discretion, in favor

of the admissibility under conditions 2 in the Hays case."

30. "The Court:
"All right, members of the jury, I have been informed that Mr. Hinton is going to testify to some transactions involving other sales to show you part of the basis for his opinion as to value. Now that testimony is hearsay and it is admitted under one of the exceptions to the hearsay rule, but I must admit it with the limitation that the testimony he gives is not proof of the actual fact or actual price. It is merely proof of the basis, or part of the basis, for Mr. Hinton's testimony about his opinion as to the market value of gas during the period in question, and you must consider it for that purpose only.
"Now in connection with your consideration of it, you should take into account the comparability of these sales. That means whether or not they were close enough in point of time, in point of quality, in point of quantity, in point of availability to market, in point of the depletion rate, in point of pressure, and the absence of objectionable content in the gas; that is, whether they would compare substantially with the gas on the Masterson Ranch, considered from those standpoints, as affecting value.
"Now this testimony will be admitted in connection with opinions given by other witnesses by both sides, offered by both sides, during the trial of the case, and these limiting instructions will relate to all of that kind of testimony. You are to judge the opinion evidence by the usual factors affecting credibility, and by this additional factor of the comparability of the sales that the witness has taken into consideration in giving his opinion.
"Anything further that either side thinks I ought to instruct them?"

to be weighed, tested and determined by the fact-finder.

■ We therefore affirm all of the points raised on the Lessors' appeal.

## III.

### Failure to Market Gas

■ The second claim on which Lessors recovered was for failure of Lessee-Pipeline reasonably to market the gas from the Masterson Ranch lease. The theory is a very simple one in statement, but complex in proof and, we shall see, in some internal ingredients. Starting with the premise that a lessee under a gas lease (or oil lease for that matter) owes a number of implied obligations reasonably to develop, produce, operate and market production, the claim here was directed to marketing. But it encompassed production, for the claim was not that gas actually produced at the wellhead was not marketed. Rather, gas being gas and ordinarily incapable of storage after production, the failure to market was really the failure to take more gas. Marketing, as such, enters the picture because the Lessee-Pipeline is a pipeline which (a) produces for its own account and (b) purchases gas from independent producers for resale. The crux of the theory was that Lessee-Pipeline allowed its self-interest from pipeline purchasing factors to override or dilute performance of its lessee obligations of reasonable diligence. In essence it was that Lessee-Pipeline had an extraordinary demand for gas to meet its system-wide commitments to its purchasers but for a variety of self-interest reasons, it chose to meet this demand by taking gas from other sources available to it, rather than from the Masterson Ranch leases. Since the Lessors did not undertake to try to prove—or even claim—that Lessee-Pipeline had failed to go out and develop further markets from potential purchasers and thereby increase demand and hence production, the theory rested on the contention that it should have taken more gas from the Masterson Leases and correspondingly less from other sources.

■ By its verdict on special interrogatories with a general charge,[31]

31. Their value is again demonstrated by the clarity with which this excises the critical issues for appellate review and enabled the trial court to correct its error on evidence by a limited second new trial, see Part I, supra. American Oil Co. v. Hart, 5 Cir., 1966, 356 F.2d 657, 659 and n. 5. However, in retrospect it now appears that we have not been precisely accurate or consistent in indicating which of subsections (a) or (b) of F.R. Civ.P. 49 come into play. In Travelers Ins. Co. v. Busy Electric Co., 5 Cir., 1961, 294 F.2d 139, 149; Vickers v. Tumey, 5 Cir., 1961, 290 F.2d 426, nn. 4 and 9, we specified 49(b). In Nesmith v. Alford, 5 Cir., 1963, 318 F.2d 110, 125, n. 30; Smoot v. State Farm Mutual Auto Ins. Co., 5 Cir., 1962, 299 F.2d 525, 533; Fall v. Esso Standard Oil Co., 5 Cir., 1961, 297 F.2d 411, 417, n. 7; Delta Engineering Corp. v. Scott, 5 Cir., 1963, 322 F.2d 11, 15; Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267, 271–272, 3 A.L.R.3d 1002; Tugwell v. A. F. Klaveness & Co., 5 Cir., 1963, 320 F.2d 866, 868; Warren Petroleum Co. v. Thomasson, 5 Cir., 1959, 268 F.2d 5, 9, n. 3, we spoke generally of F.R.Civ.P. 49 without specification of (a) or (b). This undoubtedly led one distinguished authority to state in effect that we have treated the device as a general charge with general verdict plus interrogatories under F.R.Civ.P. 49(b), rather than (a) in which there is only one verdict—answers to the special issues submitted under a general charge. See Wright, Use of Special Verdicts in Federal Court, 38 F.R.D. 199 (1965).

As there is such significant difference between the two, we would now emphasize that the practice we so often commend is based on 49(a), not 49(b), as the following cases specifically reflect. American Oil Co. v. Hart, 5 Cir., 1966, 356 F.2d 657, 659; E. L. Cheeney Co. v. Gates, 5 Cir., 1965, 346 F.2d 197, 200, 204–205 and note 14; Page v. St. Louis Southwestern Railway Co., 5 Cir., 1965, 349 F.2d 820, 824, n. 12, 827; Vandercook & Son, Inc. v. Thorpe, 5 Cir., 1965, 344 F.2d 930, 931; Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 853, 865; Davis v.

the jury accepted the Lessors' contention. For the five years in question (1957 through 1961), the jury found that with reasonable prudence, Lessee - Pipeline should have taken an additional 23.8 bcf of gas. And even with post-verdict adjustments, the amount is 12 + bcf and translated into annual terms, the added production ran from 4.7 bcf to 3.0 bcf.[32] By appropriate motion for directed verdict and j. n. o. v. Lessee-Pipeline challenges this verdict.[33] Two principal reasons are advanced. First, Lessee-Pipeline fully discharged its obligations by producing (or paying for as cancelled allowables, etc.) for all the gas that could legally be produced under Texas proration orders. Second, there is no credible evidence to sustain the finding that a prudent operator would (or could) have marketed more gas than was done. Since it is agreed that Lessee-Pipeline produced (or paid for) all gas the Texas Railroad Commission allowables permitted, and that lawfully it could have produced more gas only by an increase in allowables, the

Parkhill-Goodloe Co., 5 Cir., 1962, 302 F. 2d 489, 495, n. 6. The technique of 49(b) is admittedly fraught with many pitfalls in the potential conflicts between the general verdict and the interrogatories. Of course, the use of a general charge with the special verdict questions (which we frequently refer to as "interrogatories" to distinguish this device from the Texas or Wisconsin special issue system) is permitted under 49(a).

The Rule specifically empowers the Court to "give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." F.R.Civ.P. 49(a).

32. The gross and net figures with Lessors' ⅛th royalty based on the lesser (Item 6) is shown in the following table from Lessors' brief.

| | | Verdict v. Judgment | | | | | |
| | | (Volumes in Billions) | | | | | |
| (a) | (b) | (c) 1957 | (d) 1958 | (e) 1959 | (f) 1960 | (g) 1961 | (h) Total |
|---|---|---|---|---|---|---|---|
| 1. | Verdict | 4.700 | 4.500 | 5.000 | 4.600 | 5.000 | 23.800 |
| 2. | Cancelled Allowables | 1.535 | 3.314 | 1.222 | .433 | 1.489 | 7.993 |
| 3. | Subdifference | 3.165 | 1.186 | 3.778 | 4.167 | 3.511 | 15.807 |
| 4. | Acreage Prorate | 0 | 1.942 | 1.335 | 1.022 | 0 | 4.229 |
| 5. | Balance | 3.165 | (-.756) | 2.443 | 3.145- | 3.511 | 12.264 |
| 6. | One-eighth | .396 | | .305 | .393 | .439 | 1.533 |

By the lease terms Lessee-Pipeline was to pay royalties on cancelled allowables (item 2) and for adjustments due to so-called acreage prorate (item 4). Consequently, Lessors say, we should test the record to determine whether it supports a net finding of 12. bcf (item 5, col. (h)), averaging 3.0 bcf annually. Lessee-Pipeline insists that the gross figure, the only one found, must be justified by the record. We find it unnecessary to choose because on either, the record furnishes inadequate support.

33. It also excepted to the following charge: " * * * the [Lessee-Pipeline] was obligated by law to use that degree of diligence that an ordinarily prudent lease operator would have used * * * in marketing the production therefrom * * *." And " * * * was under obligation to use that degree of diligence * * * to obtain favorable gas allowables * * * ; and it will not be protected * * * to the extent that its own lack of diligence * * * may have contributed to an allowable lower than would have been reasonably probable, if it had used such diligence."

To this Lessee-Pipeline excepted because "there is no obligation on the lessee to use diligence in obtaining favorable gas allowables." This error is not asserted as such before us. However, for the reasons we discuss at length, the charge is inadequate.

verdict can be sustained only if the proof shows that Lessee-Pipeline (a) could have taken steps toward securing such an increase, (b) had that been done, such increase likely would have been granted, and (c) by operation of the Texas gas allowable structure, this would have resulted in added production of the verdict totals (gross or net, see note 32, supra) from the Masterson Leases. We conclude that whatever the record might be as to (a), the proof is completely inadequate as to (b) and (c).

 This greatly simplifies our treatment of the case. For we may assume without deciding, that under the broad implied obligations imposed on a gas lessee [34] there may be to one who is both lessee and a pipeline-purchaser, an obligation to use diligence and prudence in securing increased allowables. The problem is not without its difficulties, not the least of which is how a lessee-pipeline whose gas comes from many fields in many states is to operate with the prospect that as many juries as there are fields each determine that more gas should have come from that field, less from the others.[35] But the potential conflict of interest and the opportunity for discriminatory preferment, conscious or unconscious, in good or bad faith, is such that the law may find it necessary to adapt standards to assure fair conduct and fair production.

Likewise, we may assume, without deciding, that the proof here was such as to warrant an inference by the jury that the lessened production from the Masterson leases resulted from Lessee-Pipeline's subordinating the interest of Lessors—and hence submerging its own implied obligation of diligent marketing—to its self-interest as a purchaser. And, likewise, had Lessee-Pipeline been faithful to its obligations, it ought to have tried to obtain increased allowables to produce more gas from these leases.[36] In brief, the evidence developed this general thesis. Lessee-Pipeline, previously short of gas to meet demands, began committing itself, effective about 1954–1955, for huge

34. See Brewster v. Lanyon Zinc Co., 8 Cir., 1905, 140 F. 801; Walker, Property Interest Created by an Oil and Gas Lease, 11 Tex.Law Review 399, 401; 2 Summers, Oil & Gas, § 415 (1959 ed.); Brown Oil & Gas Leases §§ 16.02(4) (1958 and 1966 Cum.Supp.).

35. Always, too, is the specter of FPC supremacy. See Northern Natural Gas Co. v. State Corporation Commission of Kansas, 1963, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601; Howell & Whitworth, Recent Developments in Gas Proration, 41 Tex.L.Rev. 663; Stayton, Proration of Gas, 14th Annual Institute on Oil & Gas Law 1 (1960).

36. In the illustrative figures from the briefs, it is assumed that Lessee-Pipeline had 20% of the West Panhandle Field. With but slight differences between them, the relative percentages are:

| | Lessors' Estimate Percentage | Lessee-Pipeline's Estimate Percentage |
|---|---|---|
| Lessee-Pipeline's ownership in field | 20 | 20 |
| Masterson Ranch percentage of Lessee-Pipeline's production | 35 | 33.3 |
| Masterson percentage of total field production | 7.5 | 6.6 |

quantities of gas.[37] Typical of contemporary contracts for long time major supplies, many of these purchase (or production) commitments had take-or-pay provisions at rates per mcf greatly in excess of amounts being paid under the Masterson leases. As the term implies,[38] this binds the Pipeline-Purchaser to pay the Producer for 8/8ths (not just royalty) of the gas not produced within the prescribed minimum. More and more, the minimum follows the 1-for-8 formula by which for each 8 billion cubic feet of reserves, there is an obligation to nominate and take 1 milcf per day or 365 milcf annually or the allowable whichever is lesser. The climax of the thesis is, of course; that with system sales increasing from 225 bcf to 298 bcf, a gain of 32%, and total purchases from all sources [39] increasing from 109 bcf in 1956 to 189 bcf in 1960, approximately 73%, there was a reduction of production of the Texas wells from 121 bcf to 109 bcf. More tangibly, production from the Masterson wells declined from 41.5 bcf to 38 bcf, approximately 11% in this same period.

Without any expert [40] testimony, as such, to amplify these figures, Lessors contend that this was enough to raise a jury issue. By it the jury impliedly finds that faced with this competing, conflicting position as both lessee and purchaser with heavy economic obligations for unneeded gas in other fields, the Lessee-Pipeline cut back its takes from Lessors. But had it acted fairly as a prudent operator, it would have taken more gas from the Masterson leases in the verdict amounts.

And based upon these take-or-pay and minimum nomination formula commitments, Lessors supply a number of illustrative examples which produce results far in excess of the jury's figure for total and annual added production (see

37.

| Effective Date | Supplier | Annual Commitment (bcf) |
| --- | --- | --- |
| Jan. 1, 1954 | Phillips, Combined Carbon, Cities | |
| May 3, 1956 | Service, and Keyes Field Wells | 53.2 |
| | Pacific Northwest | 36.5 |
| Mar. 1956, 1958, 1959, 1960 | Mocane Laverne Area Oklahoma | 28 to 39 |

38. See Callery Properties, Inc. v. FPC, 5 Cir., 1964, 335 F.2d 1004, Part V, 1004, reversed in part, 1965, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284.

39.

| | Purchased Gas 1956 (bcf) | 1960 (bcf) | Percentage |
| --- | --- | --- | --- |
| Kansas | 62 | 67 | 7 |
| Oklahoma | 7.4 | 49.8 | 570 |
| Transmission Line | 8.2 | 44.5 | 439 |

40. In overruling Lessee-Pipeline's motion for directed verdict the trial Judge commented that this was not a matter for proof by experts since this would invade the province of the jury. We think this is overly narrow. Experts frequently "invade the province" of the trier of fact. It is a question of whether the subject matter at issue is such that a competent expert can throw light on the matter. See Steinberg v. Indemnity Ins. Co., 5 Cir., 1966, 364 F.2d 266. A thing as complex as this whole problem would, we believe, warrant expert testimony. McCormick, Evidence (1954) §§ 13, 17, 12.

note 32, supra) had Lessee-Pipeline made comparable or even lesser nominations.[41]

At this juncture the Lessors argue that on these implied jury findings (and our *arguendo* acceptance of them), all that is left is fixing the damages for that judicially determined breach of contract. That leads them to stress those cases which give the victim the benefit of the doubt on amount or extent when the wrong done is clearly established.[42] But it is not that simple. For whether Lessee-Pipeline breached its duty depends on whether, had it taken available steps, conditions (a), (b) and (c) above would have been met (see text following note 33, supra). Here we come to the unique business of "nominations" in the fixing of gas allowables. For Lessors agree that it would have taken both (1) increased nominations and (2) effective increased allowables to permit all or part of the added production fixed by the jury verdict.

Before undertaking the effort to abbreviate in a simplified form the intricate nomination-allowable Texas gas structure, it sharpens focus to point out that the Lessors agree that with the Lessee-Pipeline having a 20% interest in the field, nominations to secure an additional annual volume of 3.1 bcf (see item 3, col. (c), note 32, supra) from the Masterson Lease would have to exceed this by many times. Indeed, on the assumption that the Masterson wells represented $7\frac{1}{2}\%$ of the Field production (see note 36, supra) the nominations would have to total 42.2 bcf.[43] Disregarding seasonal adjustments this would average an additional nomination of 3.3 bcf monthly. Now certain mechanical problems arise. How is the nomination translated into the allowable? Does the "nominator" participate exclusively in his nomination? Is the nomination geared to a particular well or wells or lease within the field? What happens if the increased nomination is not actually produced? What happens to the allowable if the other 80% takers do not take the nominated increase?

The West Panhandle Field is a large multi-purchaser gas field with some 26 purchaser-takers and 151 producers. The basic predicate for proration rules is (a) the limitation of total production to reasonable market·demand from the field as a whole in order to prevent waste of gas (Art. 6008, § 3(h), Tex.Rev.Stat.) and (b) the protection of the correlative rights of the various producers in the field since § 12 prescribes that the total field allowable be allocated among all wells so as to give each well its "fair share." But the important thing (except for waste which is not involved here) is market demand. *Railroad Commission of Texas v. Woods Exploration and Pro-*

41. Lessee-Pipeline's reserves in the West Panhandle Field were 3.07 trillion cubic feet. Thus on a 1-for-8 formula, its nomination would be 140 bcf annually against actual nomination in the neighborhood of 88–95 bcf (except for 1959). Translating this "shortage" into the Masterson 35%, it ran from 18 to 15 bcf in contrast to the jury finding of 4–7. Contrasting actual production against this "ideal" nomination (140 bcf) the "shortage" runs 10–11 bcf in contrast to the verdict 4.7 bcf.

Another table showed comparison had nominations been made on 8-for-1 "or allowable, whichever is lesser" commitment such as in Greenwood-Oklahoma field. Against actual production averaging 111 bcf, it would have averaged 179 bcf, the annual addition to Masterson averaging 23 bcf in contrast to the verdict 4.7.

And using Lessee-Pipeline's own 1955 production as the standard (135 bcf), the "shortage" for Masterson averages 7 bcf against the verdict 4.7.

42. Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Straus v. Victor Talking Machine Co., 2 Cir., 297 F. 791, 802; Robey v. Sun Record Co., Inc., 5 Cir., 1957, 242 F.2d 684; Rynveld v. Dupuis, 5 Cir., 1930, 39 F.2d 399; Calkins v. F. W. Woolworth Co., 8 Cir., 1928, 27 F.2d 314, 320.

43. If, as Lessee-Pipeline contends, the total added production is 23.8 bcf (see item 1, col. (h), note 32, supra) averaging 4.7 bcf per year on the same formula the nomination would be approximately 62.6 bcf.

duction Company, 1966, Tex., 405 S.W.2d 313 [June 22, 1966, The Texas Supreme Court Journal, Vol. 9, p. 485 et seq.]

Unlike proration allowables for oil which is capable of being stored, transported, or held long before its ultimate consumption, gas moves uninterruptedly directly fom the well mouth to the burner tip. The market demand therefore is fixed almost directly by actual production. If the need is less than the forecast, production has to be reduced. If the demand turns out to be greater than the forecast, the production has to increase. Because of production problems, seasonal, geographic, and time changes, a considerable flexibility is essential to permit adjustment as production momentarily increases or decreases in relation to the actual, not the forecast, demand without, at the same time, forfeiting the allowables which are fixed in specific terms.

The system works generally in this way. Nominations (production forecasts or market estimates) are submitted by each purchaser-taker, summarized and reviewed by the staff of the Railroad Commission and corrected for the difference between nominations and actual production for the second preceding month. The resulting volume constitutes the monthly reservoir allowable. This is then allocated on a pro rata basis back to each well within the field as a monthly allowable for such well. For the West Panhandle field, the allocation back to each individual well is based upon a ⅓–⅔ formula (acreage and rock pressure and back pressure open flow volumes).[44] Each taker of gas submits monthly nominations (covering a 6-months' period) for the total amount of gas which that taker expects to take from the field for the particular month. Such nominations are compared to the nomination and production for the second preceding month (Rule 1).[45] Adjustments, up or down, are then made on the basis of actual production during the second preceding month.[46] That means that nominations are always adjusted to reflect actual production for the second preceding month. In the final analysis, it is actual production from the field as a whole which is the basis for a taker's fair share in the production, and not nominations and, for that matter, not even allowables.

A further adjustment is allowed in the so-called "balancing period." (Art. 6008, § 14 and Rules 4 and 5.) The balancing dates are March 1 and September 1 of each year. Wells which have overproduced—i. e., in excess of allowable—during the preceding six-month period are allowed the succeeding six-month period in which to reduce production to achieve balance, or failing that they are shut-in as required. Conversely, wells which have underproduced are allowed the succeeding six-month period to overproduce (not to exceed 200% and without waste), failing which, the allowables are cancelled. This primarily takes care of seasonal adjustments and assures that each well produces only its ratable share of production from the field for the year. The balancing process however, does not affect the current adjustment of the nomination to reflect the difference between nominations and production for the second preceding month.

After the adjustments are made to the second preceding month, the field allowable is allocated on a well-by-well basis. (Rule 2)

44. See, Atlantic Refining Co. v. R.R. Comm'n of Tex., 1961, 162 Tex. 274, 346 S.W.2d 801; Rudman v. R.R. Comm'n of Tex., 1961, 162 Tex. 579, 349 S.W.2d 717.

45. Texas Railroad Commission, Oil & Gas Docket No. 108, No. 10–13, 196, West Panhandle Field Rules, September 24, 1948.

46. E. g., if the allowable granted for the second preceding month was 10 milcf but only 8 milcf was actually produced, the 2 milcf difference (underproduction) is deducted from the nominations for the current month before allowables are granted. Conversely, if overproduction of 2 milcf occurred, that would be added to the current allowable.

Under this system, nominations are not tied to particular wells or leases. The nomination represents the nominator's estimate of the amount of gas it will need from the field. The market demand after the adjustment for the second preceding month is allocated to all wells in the field on the uniform formula.[47]

Both by testimony in this record with the illustrative exhibits and charts and by illustrative schedules prepared in response to this Court's post-argument memoranda calling for supplemental briefs, it is demonstrated that in the final analysis it is the total actual field production, not nominations, which governs allowables. In a multiple-purchaser field under-nomination or over-nomination finally has but a minor effect upon allowables and production. To the extent that actual production in the second preceding month is less than nominated for the current month, that difference is deducted from the current nominations in computing market demand. If underproduction continues, the effect is cumulative in any effort to compute the monthly nominations which would be required to achieve a particular desired increase in production.[48] This is why underproduction must be cancelled at periodic (6 months) intervals.[49]

Since the increased nomination is allocated to all of the wells in the field in fixing the allowable, the taker of 20% cannot, acting alone, assure that actual production will equal the level of the in-creased nomination to achieve the desired result. That can come only if the other purchaser-takers representing 80% of the field increase their production. It is true, of course, that production in excess of the current allowable may be done subject to balancing. But the testimony showed without doubt that with but a 20% ratable share of the total field production, had Lessee-Pipeline attempted to nominate and take 30%, its wells would have been shut-in for overproduction under Art. 6008 § 14 and Rule 5.[50] Indeed, this is precisely what happened in 1952–1953.

This means that unless the other 80% takers produced their share of increased allowables resulting from Lessee-Pipeline's increased nomination, Lessee-Pipeline would have to increase its nomination in the succeeding second month in an amount sufficient to overcome the adjustment for field underproduction. This process, once begun, pyramids at an accelerating pace because the increased nomination to overcome the anticipated adjustment creates a larger difference between such nominations and the static production by the rest of the field, which in turn means a larger adjustment will have to be offset by an even larger nomination. The result is the spiral ascendancy of the nominations.[51] Under a statute and rules requiring good faith nomination under oath it would be a distortion of the Texas regulatory scheme to require

---

47. We disrgeard the prior allocation to the so-called limited capacity wells or marginal wells.

48. Here additional nomination of 42.2 bcf is required to achieve 3.1 bcf for Masterson leases; 62.6 to achieve average 4.7 bcf annually. (See note 43, supra and related text.)

49. See Howell & Whitworth, Recent Developments in Gas Proration, 41 Tex.Law Rev. 663, 678.
 "Unless provision is made for cancellation and redistribution of underproduction, the impact of a constantly increasing underproduction in the gas pool will result in the following: Lowering the allow-ables for the wells in the pool and reducing the total output of the pool below its market demand. This would deprive operators in the pool of their opportunity to produce their fair shares of the full market demand."

50. Out of five balancing periods of 3-month cycles, the wells would have been shut in for two of the months in the second period, three in the fifth, for a total of five months out of fifteen.

51. Thus, for example, schedule A attached to Lessee-Pipeline's supplemental brief based upon actual production of 1959 and the added nominations required by Lessee-Pipeline to achieve an annual additional 5

a Lessee-Pipeline to make any such astronomical, fictional nominations. Cf. Woods Exploration & Producing Company v. Aluminum Co. of America, Tex. Civ.App., 1964, 382 S.W.2d 343.

It is an essential ingredient, therefore, of this theory that had the increased nominations been made, all or substantially all of the increased allowables resulting therefrom would have been produced by all of the interest owners in the field, both the 20% of Lessee-Pipeline and the other 80%. There is no such proof in this record. There may be some proof that some of the takers in the 80% went outside the West Panhandle field to get needed gas. But there was no effort to prove by any one or all of the other 25 takers what—or how much—they would have taken. On the contrary, all of the proof such as there is, showed without much question that as had Lessee-Pipeline, other takers had reduced both nominations and production [52] in this field. It is true, of course, that the evidence does show that Lessee-Pipeline did not produce its allowables,[53] and that for some of the years at least its nominations were considerably less than its proportionate interest [54] in the field (20%) or its actual percentage of the field allow-

bcf for the Masterson leases reveals this cyclonic effect. Against its actual nominations of 126.3 bcf for that year, if desired increased production was to come wholly from its unilateral action, Lessee-Pipeline would have had to nominate 636.3 bcf to obtain 5 bcf for the Masterson wells. This exceeded its actual nominations by four times and, worse, such nominations would exceed twice its 1960 actual system-wide total sales of 299 bcf. (see text at note 39, supra).

52.

| Year | Nominations by 80% Interests (bcf) | Actual Production by 80% Interests (bcf) |
|---|---|---|
| 1957 | 492,347 | 422,636 |
| 1958 | 487,273 | 385,989 |
| 1959 | 466,836 | 415,549 |
| 1960 | 467,054 | 388,821 |
| 1961 | 442,447 | 377,003 |

53. But this cannot justify the jury verdict since this was paid for as cancelled allowables (see note 32, supra).

| 54. (a) Year | (b) Total Field Nominations (bcf) | (c) Lessee-Pipeline Nominations (bcf) | (d) Equivalent to 20% Nomination (bcf) | (e) Shortage (bcf) | (f) If Increased Resulting Field Nominations (bcf) |
|---|---|---|---|---|---|
| 1957 | 580.947 | 88.600 | 123.087 | 34.487 | 615.434 |
| 1958 | 582.773 | 95.500 | 121.818 | 26.318 | 609.091 |
| 1959 | 593.636 | 126.300 | 116.584 | (9.716) | 582.920 |
| 1960 | 562.064 | 95.000 | 116.766 | 25.766 | 583.830 |

ables (22.48%).[55] Although in volume and percentage the ratable nomination shortage is substantial (see col. (e), note 54, supra), there is still no proof that had the increased nominations (see note 43, supra) been made, the remaining 80% interests would have taken any or substantially all of the resulting increased allowable in actual production. In the absence of that showing, this brings into play the absurd cyclonic effect of any supposed unilateral action.

▆▆ Lessee-Pipeline urges, of course, that with the evidence being deficient, we should reverse and render or remand with instructions to enter a judgment for it under its motion j. n. o. v. This we could do, but we think under the circumstances of this record, that neither Lessors nor the trial Court apparently sensed this critical element in the Lessors' claim. We think in the administration of justice that the case ought to be remanded to enable the Lessors to meet this factual proof if evidence—factual, expert, or both—is obtainable. Gulf Oil Corp. v. Wright, 5 Cir., 1965, 236 F.2d 46, 48. This does not necessarily forecast a full-blown trial. It may be that development of further facts by discovery process, affidavits, etc. will demonstrate that there is no real possibility of the Lessors ever making this proof. If that is so, summary judgment, for all or parts, would be appropriate and would terminate this claim.

But on this record, the verdict (and judgment) for failure to market may not stand.

## IV.

### FPC Primary Jurisdiction

This case, as does the other one,[56] presents the question of the jurisdiction of the Federal Power Commission over payments for royalty and especially when the amounts adjudged, or claimed to be, due are in excess of relevant FPC ceilings. As *Huber* reflects in detail, at the Court's direction there was a full exchange of briefs on the part of all counsel in both cases to the end that the Court would receive the maximum possible assistance in resolving or charting the course for resolving this important question of transcendent public importance. Because of the detail with which the matter is there discussed, little need be added by way of a brief discussion of several of the distinctive facts of this record. It is wise, however, to repeat again the caveat that apart from the construction of the royalty contract clause, the applicable legal standards as to market value, as to the implied covenant to market, and the appropriateness of the Court here referring the matter initially to the FPC under the doctrine of primary jurisdiction, our discussion is to illumine the issues and is in no sense to be a holding or an intimation thereof as to the soundness of any such contentions or a prediction of the ultimate result.

55.

| Year | Field Allowable (bcf) | Lessee-Pipeline Allowable (bcf) | Lessee-Pipeline Per Cent |
|---|---|---|---|
| 1957 | 536.613 | 118.360 | 22.06 |
| 1958 | 518.761 | 117.141 | 22.58 |
| 1959 | 539.643 | 121.183 | 22.46 |
| 1960 | 503.968 | 110.882 | 22.00 |
| | 2098.985 | 467.566 | |
| Weighted average— | | | 22.48 |

56. J. M. Huber Corp. v. Denman et al., 5 Cir., 1966, 367 F.2d 104.

The leases in question cover the greater part of the Masterson Ranch [57] and these long antedate either the enactment in 1938 of the Natural Gas Act, 15 U.S.C.A. § 717a–717w or its 1954 resuscitation by *Phillips I*.[58] After a long history of contention, controversy, and litigation, the Lessor-Landowners and the Lessee-Pipeline undertook—so they thought—to resolve all of these differences by putting the memorial of such adjustments in a single instrument which they describe as the New Consolidated Lease of April 30, 1955.[59] At the same time, it is both conceded and contended that subsequent to the 1938 enactment of the Act, there have been significant actions by the parties to the leases involving modifications and changes.[60] Of course none of these transactions was submitted to or approved by the FPC. And quite naturally because until June 1954, the Act was thought not to apply to sales at the wellhead or to initial leases.

■■■ Unlike *Huber* which involves a lease from the Landowner to the Lessee-Producer who in turn sells the gas to Northern, the Pipeline Purchaser, this transaction from its inception was a one-step affair. It is between the Landowner-Lessor and the Pipeline as Lessee and Purchaser. Considering that the Natural Gas Act applies from the date of its enactment, at least to all transactions which come into being or are significantly altered thereafter—whether the parties are aware of the existence of the legislation or whether it is being actively enforced—there is at least a possibility that, taking into account the nature and extent of the reserves of this huge gas field, at some stage or time and to some extent, this transaction ripened into a "sale" of a kind comparable to that found to exist in Rayne Field.[61] Whether or to what exent the same jurisdiction exists and the same administrative regulations would be appropriate as with respect to

57. The magnitude of these operations and the interests at stake in these lands is revealed in our prior decision, Sinclair Oil & Gas Co. v. Masterson, 5 Cir., 1959, 271 F.2d 310. This case has been severely criticized as not well considered. Brown, The Law of Oil & Gas Leases, 1958; 1966 Cumulative Supplement, p. 243 et seq. As an *Erie* [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] proposition, its vitality is severely sapped, if not extinguished, by the express repudiation of it by the Court of Civil Appeals, "the first writing Texas court," Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267, 269, in Felmont Oil Corp. v. Pan American Petroleum Corp., 334 S.W.2d 449, Tex.Civ.App., 1960, error refused n. r. e., because, that Court stated, we had ignored Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774. Perhaps the Fifth Circuit has been overruled again. United Services Life Ins. Co. v. Delaney, 5 Cir., 1964 (en banc), 328 F.2d 483, 486–487 n. 5, 6, 7, 8 (concurring opinion).

58. Philllips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

59. This merged into one the several leases executed during the years 1916, 1917, 1918, 1919, 1922, 1923, and 1926.

60. For example, the settlement of October 13, 1938, with Lessee-Pipeline (or predecessor) of the dispute over compliance with the implied obligations as to development and marketing, spacing of wells, delay rentals, etc., included a significant modification of the royalty clause. Again in 1948, the controversy was whether under the 1938 compromise, Lessee-Pipeline had complied with the covenants for development and marketing. This went to suit in the Federal District Court in Texas, resulting in a money judgment exceeding $1,000,000. The controversy and judgment was settled April 18, 1952, by prescribing a uniform ⅛th market value royalty regardless of the peculiar terms of the various leases and fixing the value at 9¢ cmf for period ending December 31, 1956, with a minimum of 9¢ thereafter. The new consolidated lease of April 30, 1955, was executed to incorporate all of the obligations including those arising under the 1938 consolidation agreement and the 1952 settlement agreement.

61. United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466.

an "independent producer," [62] or whether, on the other hand, Pipelines as Lessee-Purchasers are to be treated differently is a matter which ought first to be resolved by the FPC.[63]

But one distinction bears emphasis. Here the impact of increased royalty payments doubles the public interest problem. The Lessor sought 17¢ mcf against payments received of 10¢ to 12¢ for the years in suit.[64] But, worse, the complaint here also is for a breach of the implied obligation to market and produce and the jury verdict has found, in effect, that Pipeline-Lessee should have produced 25 billion more cubic feet of gas. (See Part III) That imposes added costs which may approach astronomical proportions in terms of quantities and increased prices per cubic feet.[65]

When it is borne in mind that holdings made in the course of the present case covering the specific years in question will or might go a long way on principles of collateral estoppel as to other years, and as stare decisis as to other parties, it is a mistake to assume that the jury verdict fixing market value which we have approved (see Part II) or reversal of the failure to market judgment (Part III) washes out this serious public interest problem.

Other details hardly warrant any mention.[66] For all of these additional reasons and those set forth at length in Part III of *Huber,* we conclude, as we did there, that the matter is arguably within the FPC jurisdiction and should be referred to them under the doctrine of primary jurisdiction for initial determination by it.

### V.

Thus, we affirm the jury verdict and judgment as to market value (Part II). We reverse and remand for consistent proceedings the claim for breach of the implied covenant to market (Part III). As in *Huber* we direct that the question of jurisdiction of the FPC overpayments for royalty be submitted first to the FPC.[67]

Affirmed in part.

Reversed and remanded in part.

---

62. 18 C.F.R. 154.91. This excludes, of course, one engaged in operating an interstate pipeline.

63. The FPC apparently does make a distinction. It has instituted and there is now pending the Pipeline Production Proceeding (RP 66–24). Current information indicates that the Commission's order instituting this proceeding has been appealed by at least three pipeline producers, including Lessee-Pipeline herein. Colorado Interstate Gas Co. v. FPC, 10 Cir., No. 8892; Natural Gas Pipeline Co. of America v. FPC, 7 Cir., No. 15819; Panhandle Eastern Pipe Line Co. v. FPC, 8 Cir., No. 18518.

64.

| Year | Royalty Paid (mcf) |
|---|---|
| 1957 | 10¢ |
| 1958 | 10¢ |
| 1959 ) | |
| 1960 ) | 12¢ |
| 1961 ) | |

65. There presently is no suggestion that under the proviso of § 1(b) the FPC would be concerned with the volume of gas to be taken and hence produced.

66. There is a suggestion that some of the gas is in intrastate, not interstate, commerce, some moving for use by the City of Amarillo and other going into the processing plants for extraction of the higher liquid carbons with the resale of the residue gas in interstate commerce. This would have to be evaluated in the light of People of State of California v. Lo-Vaca Gathering Co., 1964, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357.

67. To assure that each of the respective trial Courts, the FPC and reviewing Courts will know precisely what was before us, we direct that the Clerk of this Court will on remand include in each record copies of the pre- and post-argument memoranda from Court to counsel in both cases and all briefs, memoranda filed in both cases with respect thereto. Counsel are requested to collaborate with the Clerk in affording requisite copies.